UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SULAYMAN BATCHILLY,                          :

                 Petitioner,                 :              08 Civ. 7150 (GBD) (AJP)

         -against-                             :              **REPORT AND RECOMMENDATION**

JAMES NANCE, Superintendent,                 :
Marcy Correctional Facility,
                             :

                 Respondent.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable George B. Daniels, United States District Judge:**

              Pro se petitioner Sulayman Batchilly seeks a writ of habeas corpus from his

December 20, 2002 conviction, after a jury trial in Supreme Court, Bronx County, of first degree

sexual abuse and second degree unlawful imprisonment, and concurrent sentences the maximum

being six years imprisonment.  (Dkt. No. 3: Petition ["Pet."] ¶¶ 1-5; see Dkt. No. 13: ADA

Whetstone Aff. ¶ 12.)[1/]

              Batchilly's habeas corpus petition asserts that:  (1) the trial judge violated Batchilly's

Sixth Amendment right to present a defense by precluding a witness's alibi testimony (Pet. at 6, 41-

---

[1/]      Batchilly filed his habeas petition in July 2008 while incarcerated at the Marcy Correctional
      Facility.  (See Pet. at 131; ADA Whetstone Aff. ¶¶ 19-20.)  Batchilly was released from
      Marcy Correctional Facility on August 8, 2008 and is subject to post-release supervision.
      (ADA Whetstone Aff. ¶ 19.)

H:\OPIN\BATCHILLY

52); (2) he was denied his right to testify before the grand jury (Pet. at 6, 83-92); (3) his "Miranda rights were violated" (Pet. at 6, 37-38, 41, 92-94, 117-18, 126); (4) the prosecutor's "use of [p]erjured [t]estimony" violated Batchilly's due process rights (Pet. at 7, 39-40, 108-16); (5) the prosecutor violated Brady v. Maryland by withholding DNA evidence from the bite mark on the complainant's lip and failing to introduce into evidence the pants that she wore on December 27, 2001 (Pet. at 38-39, 98-108); (6) Batchilly's counsel was ineffective for failing to:  (a) investigate the witness's alibi and timely serve alibi notice (Pet. at 6, 11, 16, 23, 41-63, 81-82); (b) request a missing witness charge (Pet. at 6, 23, 26-27, 63-69, 81-82, 126-27); (c) consult or hire a medical expert to testify (Pet. at 6, 23, 27-31, 69-77, 81-82); and (d) ensure that Batchilly testified before the grand jury and file a motion to dismiss based on defective grand jury proceedings (Pet. at  34, 81-92); and (7) his sentence was excessive (Pet. at 7, 41, 118-19).

For the reasons set forth below, Batchilly's habeas petition should be DENIED.

## FACTS

### Huntley Hearing

On October 31, 2002, Justice Joseph Fisch held a Huntley hearing, during which Detective Marchman testified.  (Dkt. No. 13: ADA Whetstone Aff. Ex. 8: Huntley Hearing.) Justice Fisch found credible Det. Marchman's testimony that he gave Batchilly his Miranda rights, and therefore denied Batchilly's motion to suppress his handwritten statement.  (ADA Whetstone Aff. Ex. 9: Fisch 6/29/05 Order; see ADA Whetstone Aff. Ex. 2: Batchilly Handwritten Stmt.)

**The Trial**

   **The Prosecution's Case at Trial**

      **The December 27, 2001 Sexual Assault**

         In 2001, twenty-nine year old Emily Feliciano worked as a server at a Red Lobster

in the Bronx, located about sixty-five minutes by bus and thirty minutes by cab from her apartment.

(Dkt. No. 10: Feliciano 11/18/02 Trial Testimony ("Tr2.") 2-4, 6, 68.)  Feliciano worked at Red

Lobster with cook Sulayman Batchilly, who she sometimes spoke to and had a drink with at the Red

Lobster bar after work; she borrowed money from him once.  (Feliciano: Tr2. 4-5, 67-72, 101.)

Feliciano did not have a "romantic" relationship with Batchilly, but she had kissed him once inside

the Red Lobster.  (Feliciano: Tr2. 5, 23, 66, 77, 89, 101.)

         On December 27, 2001, Feliciano completed her shift at 11:54 p.m.  (Feliciano: Tr2.

7-8, 78-79, 86.)  When her shift was over, she asked Batchilly, who was sitting at the bar, for a ride

to the bus stop because the car service she used did not have any cars available.  (Feliciano: Tr2. 9-

12, 79-81.)  Batchilly initially refused, but later agreed to give her a ride to the bus stop.  (Feliciano:

Tr2. 13, 81-82, 87-88.)  Around midnight, Feliciano, Batchilly and co-workers Jason Betances and

Danisha Warfield got into Batchilly's SUV.  (Feliciano: Tr2. 13-14, 83, 86-87.)  Feliciano and

Warfield sat in the back seats.  (Feliciano: Tr2. 14-15, 87.)  When Batchilly dropped Warfield and

Betances off, Feliciano moved to the front seat.  (Feliciano: Tr2. 17-19, 88.)

         Between 12:00 and 12:30 a.m., Feliciano and Batchilly arrived at the bus depot,

which was "dark and secluded."  (Feliciano: Tr2. 19-22, 88-89.)  Batchilly put the car in park,

wrapped his right arm "[p]retty tight" around Feliciano's shoulder and neck, "pulled [her] close and asked [her] for a kiss." (Feliciano: Tr2. 22-23, 26, 89, 91.) Feliciano said "no." (Feliciano: Tr2. 23.) Batchilly said he was "horny" and "wanted a kiss and he wanted to fuck" her. (Feliciano: Tr2. 23-24.) Feliciano again said "no." (Feliciano: Tr2. 24.) When Feliciano saw the bus approach five minutes later, she tried to open the car door, but it was locked. (Feliciano: Tr2. 24-25, 89-90.) She asked Batchilly to open the car door, and he responded that "if [she] kissed him he would open it." (Feliciano: Tr2. 25.) Feeling "[n]ervous" but "notic[ing] the bus was coming," Feliciano "pecked him on the lips hoping that he would open the door, but he didn't." (Feliciano: Tr2. 25-26, 90.) When he finally opened the door, the bus was pulling away, and the next bus was not due for another hour. (Feliciano: Tr2. 26-27, 90-91, 102.)

Batchilly offered to try to catch up with the bus at the next bus stop. (Feliciano: Tr2. 27.) Feliciano accepted because "[i]t was cold and it was too secluded and too dark and [she] figured [she could] handle the situation. [She] figured nothing would happen if he just took [her] to the next bus stop." (Feliciano: Tr2. 27-28, 91.) Feliciano "didn't think he would do anything else." (Feliciano: Tr2. 102.) Batchilly, however, started driving in the wrong direction. (Feliciano: Tr2. 28-29.) Feliciano asked where he was going, and Batchilly responded that he was taking her home. (Feliciano: Tr2. 29, 31.) Batchilly was not driving towards Feliciano's home, which made Feliciano "nervous" because he had driven her home once before. (Feliciano: Tr2. 29-31, 73-76.)

Batchilly pulled over to the side of a "[p]artially lit" secluded service road in front of trailer trucks, "climbed over" to the front passenger bucket seat and reclined that seat. (Feliciano:

Tr2. 31-38, 91-94, 97.)  He "wrapped [his arm] around [Feliciano's] neck" and pressed his forearm and his approximately 220 pound, six-foot three body against her chest, "making it difficult for [her] to breathe."  (Feliciano: Tr2. 38-39, 44, 91-94, 97.)  Batchilly "touch[ed her] breast" with his other arm, kissed her on the mouth and "[b]it [her] upper lip."  (Feliciano: Tr2. 37-39, 41-42, 94.)  Feliciano unsuccessfully tried to "[f]ight[] him off."   (Feliciano: Tr2. 37, 40, 94-95.)  Batchilly unzipped her pants, "managed to get his hand inside" them and "stuck [his fingers] inside [her] vagina." (Feliciano: Tr2. 40, 42, 44.)  Feliciano tried to push herself up along the seat to get into the rear of the car, but stopped when she realized that she was "making it easier" for Batchilly to "accommodate himself to [her] body."  (Feliciano: Tr2. 42-44.)  He pulled her pants and underwear down and tried to "put his penis inside [her] vagina."  (Feliciano: Tr2. 44-47, 95-97.)  Feliciano "push[ed] him off." (Feliciano: Tr2. 47.)  He "applied pressured against [her] chest," making it difficult for her to breathe.  (Feliciano: Tr2. 47.)  "When he finally got it in, [s]he started to [g]et dizzy.  [She] closed [her] eyes, . . . ." (Feliciano: Tr2. 47-48)  As Feliciano continued to try to push him off, he "screamed" into her ear and ejaculated inside of her. (Feliciano: Tr2. 48-49, 96.)

       Batchilly "jumped" back into the driver's seat and pulled up his pants.  (Feliciano: Tr2. 48-49.)  In a state of "shock," Feliciano stayed "frozen" with her "legs separated up in the air" for about ten minutes.  (Feliciano: Tr2. 49-51, 97-98.)  Batchilly began driving towards Feliciano's home and Feliciano "pulled [her] clothes back on." (Feliciano: Tr2. 50-52, 98.)  Besides confirming where she lived, Batchilly and Feliciano were silent during the ride to Feliciano's apartment. (Feliciano: Tr2. 50-52, 97-98.)  When they arrived at Feliciano's apartment building, Batchilly "put

his arm around [her] neck again" and told her "not to say anything, to keep quiet." (Feliciano: Tr2. 52-53.)  Feliciano "told him no, and [she] slammed the door shut and went in" her apartment building. (Feliciano: Tr2. 53, 65.)

About five to seven minutes later at approximately 1:30 a.m., after signing the log book at the security desk and running up five flights of stairs, Feliciano entered neighbor Yvette Motta's apartment to use Motta's phone because she did not own a phone. (Feliciano: Tr2. 53-55, 65-66, 98; Dkt. Nos. 8-9: Motta: Trial Transcript ("Tr.") 560-61, 570-71.) Feliciano "threw [her]self on to [Motta's] chest," "collapsed," and hysterically "scream[ed]" that she had just been raped by Batchilly. (Feliciano: Tr2. 55-56; Motta: Tr. 561.)  Feliciano had a swollen upper lip with a bite mark, a swollen face and scratches on her eyes and nose. (Feliciano: Tr2. 66; Motta: Tr. 561-65.) Feliciano did not have any of these marks the prior day. (Motta: Tr. 565.)  Feliciano, who was "hysterical" and "shaking," disrobed and Motta observed marks on Feliciano's arm that looked "[l]ike she had been squeezed," "reddish" and "very light" black and blue marks on her inner thighs and "[l]ight" "red blotches" on her rib cage. (Motta: Tr. 565-69.) Feliciano did not shower. (Motta: Tr. 568.) Motta's daughter called the police and called Feliciano's mother, Irma. (Feliciano: Tr2. 56-57; Motta: Tr. 567-68; Irma Feliciano: Tr. 577-78.)  Feliciano cried to Irma, "'Mom, I was raped.'" (Feliciano: Tr2. 57; Irma Feliciano: Tr. 577-78.)

Five to ten minutes later, the EMS and police arrived, and an ambulance transported Feliciano to the St. Barnabas Hospital emergency room, where she arrived at 1:42 a.m. (Feliciano: Tr2. 57-58; Motta: Tr. 568-69; Klie: Tr. 478-81.)  The emergency room classified her as "priority,"

which is reserved for the "most acute cases that come in, more serious ones." (Klie: Tr. 479-80.) Feliciano told emergency room attending physician Dr. Thomas Klie that she had been raped and was experiencing pain around her vagina. (Feliciano: Tr2. 58-59, 61-62; Klie: Tr. 470-71, 476, 478-79.)   Dr. Klie noticed a bite mark on her upper lip.  (Klie: Tr. 479, 483, 499, 501-06.)   The EMS report noted that she had complained of shortness of breath and had claimed that she had been raped. (Klie: Tr. 481, 483-84.)

Dr. Klie and a resident performed a "rape kit" examination, consisting of taking swabs from Feliciano's bite mark and her vagina, "collect[ing]" her underwear and drawing blood. (Feliciano: Tr2. 60-61, 64; Klie: Tr. 484-91.)  Dr. Klie did not see any external vaginal trauma, but he had not seen any vaginal trauma in the twenty or thirty rape kits he had performed.  (Klie: Tr. 491-93, 500.)  Feliciano received a tetanus shot for the bite mark on her lip, antibiotics to prevent sexually transmitted diseases and the morning after pill to prevent pregnancy.  (Feliciano: Tr2. 61; Klie: Tr.  494-95.)

When Irma arrived at the hospital, she found Feliciano "sobbing" in the emergency room and noticed her swollen upper lip with a "bruise" or "bite" mark, a red line across her nose and cheek, a "very light" bruise on her neck and "[r]ed marks" on her chest.  (Irma Feliciano: Tr. 579-83.) Irma asked the doctor to take pictures of Feliciano's injuries, but the doctor did not answer and walked away.  (Irma Feliciano: Tr. 583.)  After the night in the hospital, Irma and Feliciano never discussed the rape again because Feliciano was "very upset and she was getting some counseling" and she "didn't want to talk about it."  (Irma Feliciano: Tr. 586-88.)

8

### Batchilly's Statement to the Police

_____At approximately 10:15 a.m. on December 28, 2001, after a telephone conversation

with police, Batchilly voluntarily went to the Bronx Special Victim's Squad.  (Dkt. No. 11:

Marchman: Tr3. 6, 24, 34-35.)  Detective Michael Marchman led Batchilly, who was not handcuffed,

into an interview room.  (Marchman: Tr3. 7, 16, 20-21.)  Det. Marchman was the only detective who

interviewed Batchilly.  (Marchman: Tr.3. 22.)  Batchilly did not appear to be intoxicated or on

medication.  (Marchman: Tr3. 12-13, 20.)  Det. Marchman administered Miranda warnings to

Batchilly.  (Marchman: Tr3. 7-12, 25.)  Batchilly answered "'yes'" to all of the Miranda questions and

signed the Miranda form.  (Marchman: Tr3. 8-13.)  Det. Marchman informed Batchilly that someone

had accused him of rape, and Batchilly orally denied the accusation.  (Marchman: Tr3. 13-15, 24-27,

30-31.)  Batchilly reduced his oral statement to writing and signed it.  (Marchman: Tr3. 15-18, 31,

34.)  The written statement read:

> "On Thursday, 12/20/01, after work Jason, D[a]n[]isha, and her co-worker
> Emily [Feliciano] ask me for a ride.  After dropping [off] Jason and D[a]n[]isha,
> Emily was dropped off on the bus stop where people [were] waiting for the bus.
>
> After I went to pick up my friend Ingrid from Applebee's to take her home.
> Ingrid and I was having a conversation about work.  After that took my way to Long
> Island.  A few hours after I received a phone call from Gary, my co-worker, telling
> me there is two officers looking for me and I ask him why.  He's respond is he don't
> know and I speak to one of the officers.  I still don't get any information until now.
>
> I still don't know what's going on.  If this is a setup from somebody who got
> something against me and I don't know.
>
> I really don't know nothing after I drop off everybody."

H:\OPIN\BATCHILLY

(Marchman: Tr3. 18-19, emphasis added, <u>accord</u> Dkt. No. 13: ADA Whetstone Aff. Ex. 2: Batchilly Handwritten Stmt.)  The statement was completed at around 10:40 a.m.  (Marchman: Tr3. 19.) Det. Marchman did not ask Batchilly if Batchilly ever had a sexual relationship with Feliciano, and Batchilly did not claim to have had consensual sex with Feliciano earlier in the day.  (Marchman: Tr3. 19, 26, 31-32, 35.)  After reading the statement, Det. Marchman arrested Batchilly.  (Marchman: Tr3. 18, 21.)

### DNA Testing of the Rape Kit

Linda Frese, a criminalist for the New York City Chief Medical Examiner's Office, tested Feliciano's "dried secretions, swabs, the orals swabs, the vaginal swabs, [and] the underwear." (Frese: Tr. 590-92, 606-08.)  Semen was detected on the vaginal swab and the underwear.  (Frese: Tr. 610-15.)  The DNA profile gathered from Feliciano's underwear and vaginal swab matched the DNA profile from a blood sample that had been taken, by court order, from Batchilly.  (Frese: Tr. 615-22; Barriteau: Tr. 534-36.)  Such a DNA match would be expected to be found in one in one trillion people.  (Frese: Tr. 623-24.)

### Arraignment Record

The People entered into evidence the following statement that Batchilly's arraignment counsel made:

> "There are several witnesses who were with him when he left work that evening with this woman who, by the way, he did not want to give a ride to the bus stop.  He had witnesses who will support him.  He had two friends who were in the car when he left work that night.  Also a co-worker.  One was seated in the front seat and the one was seated in the back seat and witnesses to the fact that she jumped in the back seat and insisted he drives her to the bus stop which he did not want to do.

This someone who had a crush on him for a long time.  Someone else was who was standing at the bus stop are the reasons why he is talking that he doesn't understand how he could be accused of this crime.  <u>After he did drop her off at the bus stop he ran into someone who he knew at the bus stop</u>, a man who lives in the building and after he dropped this woman off he was talking to that man for a period of time after dropping his friends off and was headed out to Queens to his sister's house to get a call on his cell phone from the co-manager at Applebee's, a man by the name of Gary Hunter who calls to tell him that two police officers who came to Applebee's looking for him, wouldn't tell him why they were looking for him.

"He tried to speak to the Police Officer Gary, but the police officer was on the phone and the police officer said:  Well, I can't give you any information now, but my partner is on the way.  He will talk to you.  He has witnesses to support the fact that he was with them both before he dropped this woman off.  And then after he dropped her off at the bus stop."

(Gordon: Tr. 522-24, emphasis added; <u>accord</u> Dkt. No. 13: ADA Whetstone Aff. Ex. 4: 12/29/01 Tr. at 3-4.)

### Batchilly's Case

### Lynval Brown's Testimony

Lynval Brown, a waiter who worked at Red Lobster with Batchilly and Feliciano, had known Batchilly for five and one-half years and "h[u]ng out" with him two to three times a week. (Brown: Tr. 651-53, 666-69.)  Brown had seen Batchilly and Feliciano "hanging around with each other [and] hugging," holding hands when they left work together, and he saw them kiss "one time" at work.  (Brown: Tr. 653-56, 696-97.)  Batchilly had told Brown that he was dating Feliciano. (Brown: Tr. 696-98.)  Brown never told the police about Batchilly and Feliciano's relationship because neither the police nor the District Attorney's Office contacted him. (Brown: Tr. 698-99, 701-03.)

On December 27, 2001 between 11:30 p.m. and midnight, Brown saw Batchilly leave Red Lobster with Feliciano, Betances and Warfield while he was still cleaning up. (Brown: Tr. 658-60, 665, 682-84.)  According to Brown, gypsy cabs are "always" available outside the Red Lobster at midnight. (Brown: Tr. 660-62, 691-92.)

### Danisha Warfield's Testimony

Danisha Warfield waitressed at Red Lobster part time and had known Batchilly for approximately three years. (Warfield: Tr. 706-09, 713, 725, 728-30.)  Warfield met Feliciano while working at Red Lobster on December 27, 2001.  (Warfield: Tr. 710.)

On December 27, 2001, Warfield finished working at Red Lobster between 11:30 p.m. and midnight.  (Warfield: Tr. 710-11, 714.)  When she walked outside, she observed Betances standing and Batchilly sitting in his SUV.  (Warfield: Tr. 714-15. )  Batchilly offered her a ride home.  (Warfield: Tr. 714.)  Betances got into the front passenger seat and Warfield got into the back seat.  (Warfield: Tr. 716.)  Batchilly walked back into Red Lobster and Feliciano got into Batchilly's car.  (Warfield: Tr. 716.)  When Batchilly returned to his car, he did not want Feliciano in the car, but did not force her to get out of the car.  (Warfield: Tr. 717.)  Batchilly left the Red Lobster parking lot between 11:30 p.m. and midnight and dropped off Betances and next Warfield. (Warfield: Tr. 717-18, 732-33.)  Feliciano moved to the front seat.  (Warfield: Tr. 718-719, 733.)

Warfield remembered that night because she left her license, registration and apron in Batchilly's car and could not retrieve them the next day due to Batchilly's arrest.  (Warfield: Tr. 723, 733.)

### Jason Betances' Testimony

Jason Betances worked as a server at Red Lobster with Batchilly for approximately five to six years and they socialized outside of work.  (Betances: Tr. 741-43; 764-66.)  Betances met Feliciano at work in 2001.  (Betances: Tr. 744-45.)

On December 27, 2001, Betances worked the night shift at Red Lobster.  (Betances: Tr. 743-44.)  That night, he saw Feliciano, who he had met a few months earlier at Red Lobster, talking to Batchilly.  (Betances: Tr. 759-60, 785-86.)  He saw Batchilly put his arm around Feliciano and probably give her a kiss.  (Betances: Tr. 760.)

On December 27, 2001 between 11:00 p.m. and midnight, Betances finished his shift and got into the front seat of Batchilly's SUV; Warfield got into the back seat.  (Betances: Tr. 746-47, 756, 788.)  Feliciano approached Batchilly's car, but Batchilly told her "numerous times not to get into [the] car."  (Betances: Tr. 747-48.)  Batchilly returned to Red Lobster.  (Betances: Tr. 748, 780-81.)  Feliciano got into the back seat of Batchilly's car.  (Betances: Tr. 747-48.)  When Batchilly returned to his car and noticed Feliciano in the back seat, he said, "'[w]hat are you doing in the car? I'm not taking you home.'"  (Betances: Tr. 748-49.)  Batchilly dropped off Betances first.  (Betances: Tr. 749.)

### Ingrid Hoo-Hing's Testimony and the Alibi Colloquy

On December 27, 2001, Ingrid Hoo-Hing, a twenty-one year old Bronx Community College student, worked from 5:00 p.m. until midnight at the Applebees near Red Lobster.  (Hoo-Hing: Tr. 796-800.)  Batchilly, who also worked in Applebees kitchen and met Hoo-Hing when she

began working at Applebees the previous October, arrived at Applebees at "around 12:30, 1 o'clock." (Hoo-Hing: Tr. 798-800.) Batchilly, who was "coming from work," appeared "[c]alm" and "[s]habby as usual." (Hoo-Hing: Tr. 800.)

Upon the introduction of the above testimony, A.D.A. Singer objected because Hoo-Hing "attempt[ed] to place [Batchilly] at a different place at approximately the same time as [Batchilly] was allegedly raping [Feliciano]," but Batchilly had failed to timely serve an alibi notice. (Tr. 801.)  The following colloquy occurred:

> THE COURT:  What time did the complainant [Feliciano] claim she left the restaurant?
>
> [A.D.A.] SINGER:  That they left the restaurant around midnight.  That the people were dropped off around 12:10 or so.  That this whole thing took place between that time period and that he dropped her off at one o'clock.
>
> THE COURT:  Counsel, how is this not an issue of the alibi.
>
> [A.D.A.] SINGER:  Also the Sprint [911 call] report shows the time it was made.
>
> [DEFENSE COUNSEL VICTOR] SCHURR:  I asked the complaining witness and she said the rape began about 12:10 in the morning and it ended approximately 15 minutes after that.
>
> [A.D.A.] SINGER:  That's not the testimony.
>
> THE COURT:  Counsel, even if she say that she laid paralyzed ten minutes on the way home.
>
>  So you are squarely within the time frame that she was testifying to.
>
> MR. SCHURR:  The People's indictment she meant to elicit at 12:30.

THE COURT:  You just had your witness testify that she saw him at 12:30, counsel.

MR. SCHURR:  . . . .  She says perhaps between 12:30 and 1.  That's after.

THE COURT:  No, counsel, you are just playing with words, counsel.  This is definitely in the nature of an alibi.  You have a complainant placing the alleged rape within, say, a 45 minute window at the most, counsel, between 12:10 and quarter of one.

You have got a witness now saying that she saw him at approximately 12:30.  What could be more of an alibi that he is back at the restaurant when the complainant claims that he is raping her in the car.

Counsel, this is fundamental law.  You are required to provide the People with an alibi notice.  You did not do so.  The sanction is preclusion, counsel.

MR. SCHURR:  I'm not going to bring an alibi that's why I gave no notice.  I'm going to say after whatever event that the People are alleging that he saw this person.

THE COURT:  You had her give a time frame, counsel.  The time frame is squarely within the window testified to by the complainant that was indicted by the Grand Jury.

[A.D.A.] SINGER:  Not only that, . . . , but I specifically asked for a proffer for what people were going to testify for this reason alone . . . and when I asked about this specific witness I was told it had to do with stuff that happened after the alleged rape.  Then she gets on the stand and gives a time frame that is squarely within the time frame that my witness said the rape occurred in the car.

I don't know what more to say.  I asked it.  I[] was told that wasn't going to happen and it just happened.  I'm asking for a preclusion of this witness and asking it all to be struck.

THE COURT:  What other remedy could be possible here.  This is an alibi witness.  You did not give notice.  We're at the point that she is testifying before the jury and has already alluded to a time frame that falls within the time frame testified to by the complainant, counsel.

The law is clear here that preclusion is the appropriate sanction and there is no violation of any statutory or constitutional right if I invoke that sanction and in light of everything else that has gone on in this case, counsel, what conceivable reason would I have[ ] for not doing that?

MR. SCHURR: Because there was no allegation that he was somewhere else. I was told and I met the witness last night for the first time, and –

THE COURT: Counsel, would you agree there is a difference between being in a car on a [N]ew England Thruway raping somebody and being at Applebees talking to a co-worker.

MR. SCHURR: Of course. What I'm saying by her testimony closer to one o'clock if you want to establish that, that we are not saying that he was.

THE COURT: It's not up to me to say one o'clock. You had a witness that said around 12:30. You are suggesting that we push it another half hour to take yourself out of the requirement of giving alibi notice, counsel.

Your own witness did say that.

MR. SCHURR: She mentioned to me last night it was closer to one o'clock.

THE COURT: Even if it's closer to one o'clock, counsel, given the time frame th[at] was testified to here, this is squarely within that time frame, counsel. You got him according to the complaint he is how many blocks away, People, and then taking her to her home.

[A.D.A. SINGER]: A forty minute drive. It's at least a 40 minute bus ride. I don't want to say it's a 40 minute drive. It certainly, it's not a skip or a jump away from there. They are not near each other at all.

MR. SCHURR: Why don't I ask her if it was a little bit later.

THE COURT: No, counsel, come on. What you are trying to after the fact to remedy what you have done, counsel, is to provide the People with alibi notice.

You have already prejudiced the People's case with her testimony so far. I'm going to strike her entire testimony.

H:\OPIN\BATCHILLY

(Tr. 802-06.)

Justice Tallmer informed the jurors that for "legal reasons that need not concern you," they should "disregard" Hoo-Hing's testimony "in its entirety." (Tr. 806-07.)

**Arraignment Record**

Defense counsel Schurr entered into evidence the following statement that Batchilly's arraignment counsel made:

> "'So [Batchilly] left his phone number with a police officer said call me back as soon as you know anything more.' When the second detective got to Applebees he called Mr. Batchilly on his cell phone and still wouldn't discuss the case with him and Mr. Batchilly made an arrangement to meet him . . . . at Bagel Cafe which is located approximately three stores away from where [Batchilly] works. He got turned around and in the car, went to the Bagel Cafe to meet this police officer to find out what's going on.

> "When he got to the police precinct there was nobody there. He then called the 45th Precinct and [they] told him: Okay, we know who you are. Why don't you come in. When you come in ask for Tony which he did. He went to the 45th Precinct. He asked for this person Tony. When he got to the 45th Precinct he was told: No, we are not supposed to meet you, go to the 47th Precinct which he did.

> "When he went to the 47th Precinct, police officers who were there didn't know what this was about.

> "First, he made a phone call to figure out why the matter was there. He waited approximately a half hour. Two detectives came at which point he made the statement which you heard and he was arrested.

> "So I think he has shown a real concerted effort he made to surrender himself on this case."

(Tr. 807-09; <u>accord</u> Dkt. No. 13: ADA Whetstone Aff. Ex. 4: 12/29/01 Tr. at 5-6.)

**Batchilly's Testimony**

Thirty-four year old Batchilly, who had worked at the Bronx Red Lobster since 1996 and "was in charge of the kitchen," met waitress Feliciano in July 2001. (Batchilly: Tr. 810, 812-13.) A "couple of weeks" after meeting, they commenced a "sexual relationship," having sex once or twice a week before work at the Holiday Inn near the Red Lobster. (Batchilly: Tr. 813-16, 918-19, 937, 939, 941.) When they met at the Holiday Inn, Feliciano "always" asked Batchilly for money, and he usually gave her between thirty and fifty dollars a week. (Batchilly: Tr. 814, 816-17, 937-38.) Feliciano "was trying to build a relationship with [Batchilly], but [he] didn't want to get involved with a serious relationship. So [he] let her know that from the beginning. This is going to be only sexual. This is not a relationship." (Batchilly: Tr. 816, 938-39, 941.)

On the afternoon of December 27, 2001, between 12:30 p.m. and 1:00 p.m., at Feliciano's suggestion, Batchilly rented a $45 room at the Holiday Inn and signed in using his initials. (Batchilly: Tr. 817-19, 945-47.) Once in the hotel room, Batchilly and Feliciano had unprotected sex. (Batchilly: Tr. 819, 947-48.) Afterwards, Batchilly told Feliciano that they needed to "'back off a little bit'" because they had only been "going out together [for] a couple of months." (Batchilly: Tr. 819-20, 941-42, 948.) When Feliciano began talking about "having a baby [and] raising a family," Batchilly reminded her of her financial problems and that they were "not in a serious relationship. This is a sexual relationship." (Batchilly: Tr. 820, 941-42, 948, 951.) Feliciano became a "little bit upset," but Batchilly "calm[ed] her down." (Batchilly: Tr. 820, 948-49, 951.) Feliciano expressed her jealousy over Batchilly talking to other female waitresses at the restaurant,

but Batchilly responded that he had to talk to all the waitresses because he "r[a]n this kitchen." (Batchilly: Tr. 821.)

After the conversation, Batchilly and Feliciano had protected sex because Batchilly insisted on using a condom. (Batchilly: Tr. 821-22, 942-43, 948-49). When they were finished, Feliciano tied up the condom and said, "[l]ook what you are wasting. I could give you a baby with this; right?" (Batchilly: Tr. 822, 943.) Batchilly laughed and responded, "[y]ou better throw this away." (Batchilly: Tr. 822, 943.) When Batchilly and Feliciano left the motel around 4:00 p.m., Feliciano still "had the condom with her." (Batchilly: Tr. 822-23, 943-44, 949-50.)

While at work that evening, Feliciano repeatedly told Batchilly that if she "can't have [him] nobody will have [him]." (Batchilly: Tr. 822, 825.) At around 11:30 p.m., Batchilly finished work and offered Betances and Warfield rides home. (Batchilly: Tr. 825-26.) The three of them walked towards Batchilly's car, but Batchilly turned around when he realized he left his uniform at Red Lobster. (Batchilly: Tr. 826-27.) On his way back to Red Lobster, Feliciano asked him for a ride home. (Batchilly: Tr. 826-27, 952-53.) Batchilly said he could not do so because he had to go to Applebees. (Batchilly: Tr. 827, 952-53.) When he returned to his car, Feliciano had already "jumped in the car." (Batchilly: Tr. 827, 953.) Batchilly responded, "[w]here do you think you are going? Can you please get out of the car. I'm not going to go in that direction. I know we live in that same area, but I'm not going home. I cannot drop you off." (Batchilly: Tr. 827.) Batchilly decided to drop Feliciano off at the bus stop after dropping off Betances and Warfield because Feliciano wanted to talk with Batchilly. (Batchilly: Tr. 829.)

When Batchilly dropped off Betances and Warfield, Feliciano moved to the front seat. (Batchilly: Tr. 954-55.) Between 12:15 and 12:20 a.m., Batchilly dropped off Feliciano at the well lit Bartow Avenue bus depot, where eight to ten people were waiting for the bus. (Batchilly: Tr. 829-31, 956.)

Batchilly, who was a manager at the Applebees in the same plaza as the Red Lobster, drove directly to Applebees, arriving at "around 12:28, 12:30" a.m. (Batchilly: Tr. 831.) He did paperwork for the upcoming Saturday orders "for a good half hour." (Batchilly: Tr. 831, 958.) Batchilly "r[a]n into" Ingrid Hoo-Hing, an Applebees server. (Batchilly: Tr. 831-32, 957-58.) Batchilly left Applebees with Hoo-Hing at approximately 1:00 a.m. and began driving Hoo-Hing home. (Batchilly: Tr. 832-33, 958.) While en route, Batchilly received a call from Applebees co-manager Gary, who notified him that two police officers were looking for him. (Batchilly: Tr. 833, 922, 957, 959.) A police officer got on the phone and told Batchilly that his partner was on the way to Applebees. (Batchilly: Tr. 833.) Batchilly dropped off Hoo-Hing at home and headed to Queens to visit his sister. (Batchilly: Tr. 833-34, 957-60.) The officer called again and directed Batchilly to return to Applebees, but refused to tell Batchilly why he wanted to talk to him. (Batchilly: Tr. 833-34, 922-23, 959-60.) When Batchilly arrived at Applebees, the officers had left. (Batchilly: Tr. 834-35.) Gary told Batchilly that he thought the officers were from the 45th precinct. (Batchilly: Tr. 835.)

When Batchilly arrived at the 45th Precinct, he was diected to go to the 47th Precinct. (Batchilly: Tr. 835, 923.)   At the 47th Precinct, police officers informed him of a woman's "allegation[s]" against him and arrested him.  (Batchilly: Tr. 835-37.)

Around 8 or 9 a.m., Det. Marchman arrived and took Batchilly to an interview room and informed Batchilly of Feliciano's rape allegations.  (Batchilly: Tr. 837-38, 924.)  Batchilly made an oral statement followed by a signed written statement.  (Batchilly: Tr. 839, 925-27.)  When Batchilly finished signing his written statement, Det. Marchman read Batchilly his Miranda rights and Batchilly initialed and signed the sheet waiving his Miranda rights.  (Batchilly: Tr. 924-27.) Batchilly "knew that by signing [the Miranda waiver sheet he was] then waiving [his] right." (Batchilly: Tr. 927.)  Batchilly did not mention in his statement what happened during the previous afternoon at the Holiday Inn because he "just answer[ed] the question [Det. Marchman] asked [him]. That's all [he] did.  [He] explained what happened last night and [he] gave [Det. Marchman] what [Det. Marchman] wanted to know about last night; not about what happened in the afternoon." (Batchilly: Tr. 839, 842, 928-31.)  He did not mention his relationship with Feliciano, even though it was an "important" part of the story, because "nobody never asked [him] a question about it." (Batchilly: Tr. 919, 929, 931-33.)

Batchilly denied raping Feliciano, biting her lip or injuring her.  (Batchilly: Tr. 842.) Batchilly, who was too tall (6'4") to stand in his car or move from the driver's seat to the passenger seat, opined that Feliciano was accusing him of rape because

she already warned [him] from the beginning.  "If [she] can't have [him] no one will have [him]."  And [he] was not trying to get into a relationship with her.  And the

same night, before she got out of the car, when she was getting out of the car she told [him], "[She's] going to get [him]."

(Batchilly: Tr. 843.)  Batchilly first learned in August 2002 of the DNA match between his blood and the semen found in Feliciano's underpants.  (Batchilly: Tr. 962-64.)

Batchilly thought that his attorney's recitation at arraignments of the events of December 27, 2001 "[s]omewhat accurate[ly]" reflected what Batchilly had told her.  (Batchilly: Tr. 840-41, 961-62.)

### Continuation of the Alibi Colloquy

Between Batchilly's testimony on direct and cross-examination, Justice Tallmer noted the emphasis that <u>Noble</u> v. <u>Kelly</u>, 246 F.3d 92 (2d Cir. 2001), placed on a defendant's reason for failing to serve alibi notice.  (Tr. 850-52.)  Justice Tallmer asked whether Batchilly had been Hoo-Hing's co-worker and friend "from day one."  (Tr. 852.)  Defense counsel Schurr responded that Batchilly and Hoo-Hing had been friends "from the beginning of [the] case," but that he had not spoken to Hoo-Hing until five days earlier.  (Tr. 852-53.)  Schurr did not initially add Hoo-Hing to the witness list because Batchilly did not inform him of her until the day before jury selection began.  (Tr. 853-54.)  Justice Tallmer asked whether Batchilly and Schurr ever discussed an alibi defense.  (Tr. 854.)  Schurr replied, "[n]ot all, Judge.  In fact, [Batchilly] had just told me that after he dropped [Feliciano] off . . . he went to another place and the discussions of alibi never came up at all, Judge, under no circumstances."  (Tr. 854.)  Schurr stated that, other than at his meeting with Hoo-Hing the night before her testimony, he had only spoken to her over the phone once to confirm their appointment.  (Tr. 855-56.)

The following colloquy occurred:

THE COURT:  What were you planning to call her for if you hadn't spoken to her.  The People asked for an offer of proof, and I believe you said "eyewitness" is what you said, counsel.  So presumably to make that offer in good faith you had to know something about the substance of what she testified to.

MR. SCHURR:  I did not, Judge, because [the defense investigator] Mr. Jones was looking for her.  I was not able to reach her.  I have been finally provided with telephone numbers and then the first time around 6:30 on the 20th of November is when I met that witness face-to-face along with another witness.

THE COURT:  So when you told the Court in your offer of proof that she was an eyewitness that was based upon what, counsel?

MR. SCHURR:  I didn't mention the word eyewitness because I didn't know.  I never mentioned the word eyewitness, I said possible witness.

THE COURT:  No, that wasn't your word, counsel.

. . . .

MR. SCHURR:  I had never spoken to this witness and I have the investigator.  You want me to call the investigator, Judge, he will be here to testify that I have never spoken to that witness until the night before she testified.

THE COURT:  Let me get this straight, counsel, what you are saying is that the failure to find out what the substance of her testimony was and, therefore, to give alibi notice was due directly to your incompetence and negligence and nothing to do with willfulness; is that what you are saying?

MR. SCHURR:  No, Your Honor.  I'm not saying any incompetence.  I'm just saying to you none of these witness.

THE COURT:  Counsel, let me get this straight.  Your client advises you that there is a person who will testify that after he dropped off the victim can put him in another place and you never see fit to interview her even though you know of her existence and you know of her name prior to jury selection until the night before she testifies and even though then you didn't advise the Court and the People of the substance of her testimony.

MR. SCHURR:  Judge, I was not able not only with her, but other witnesses. No one ever came forward, no one.

. . . .

[A.D.A.] SINGER:  First and foremost the People did ask for an offer of proof for the witnesses who were added after the original witness list was given to Your Honor and to the People and the People were told that this person was going to testify to events that transpired after the drop off of the female.

So he had to have spoken to her at some point prior to that because he was allowed to, he was giving me some detail as to what it was that she was to testify to.

. . . .

The phrase was he was going to testify to what happened afterwards and then I was also informed at some point during the course of this trial at different times when we have had adjourned dates in Judge Barrett's part that this person was his girlfriend.

Right now to testify or to state on the record that his client didn't know where this person was and had no interaction with her is ridiculous.

THE COURT:  Wait.  Wait.  When you say <u>you have to distinguish between two things, his client's knowledge, which I don't think anybody is disputing here and counsel's knowledge because there are two different things</u>, and to [the] extent that we are implicating counsel's knowledge because of defendant's failure to give him information or if a witness he knew would be favorable to speak with him.

A.D.A. SINGER:  No[w] I'll also draw your attention to [Batchilly's written statement] in which that "Alibi witnesses name was mentioned."  Discovery was handed over to defense counsel at least six-and-a-half months ago.  Had he bothered to look through it?  There was the issue staring him right in the face.  To come in here in the middle [of] trial before he rests –

. . . .

THE COURT:  All right, this case that "he dropped [Feliciano] off at the bus stop and after I went to pick up my friend Ingrid from Applebees to take her home."

Now, People, that may have put counsel on notice as to the existence of Ingrid and didn't it put you on notice of the possibility that Ingrid would testify to his whereabouts post dropping Emily [Feliciano] off?

[A.D.A.] SINGER:  Post.  Not in the middle of the rape which is what she testified to.

If counsel had looked through the discovery he would have known that she was going to testify and how she was going to testify.

To say now that he had no idea about who she was and how to get in touch with her is completely disingenuous.

THE COURT:  When you say disingenuous, are you saying, People, that you think counsel is not telling the truth when he says he learned of the information?  I need to start with that.

Is that really your position or that he should have learned or that any reasonable diligent attorney would have learned of it?  Which is it, people?  I need to know.

Because one under this case seems to be excusable in terms of not invoking the ultimate sanction of preclusion and the other does not.

If you are saying he is lying, then we are talking about a willful failure.  If your are saying that he was negligent in following up, that's different.

[A.D.A.] SINGER:  Well, I think its two-fold.  I think there is non-compliance with the discovery rule that requires him to give the Court and the prosecutor notice that he is going to call this witness; and second of all, I think it's misleading to tell the Court at this point that he has no knowledge of and understanding of where this witness' whereabouts are.  It's ludicrous.  We also had a Huntley Hearing not too long ago.  That it's impossible that that statement wasn't analyzed.  The existence of this witness has been known by the defense for a while.

THE COURT:  I didn't understand counsel saying that he didn't know where she was.  I thought he was saying until Wednesday he did not know that she would place him at a scene other than in his car.  Is that what[ ] you are saying, counsel?

MR. SCHURR:  Yes.

THE COURT:  Unless you are saying that counsel is not telling the truth when he says this, People, and of all things that have happened in this trial I don't have any reason to dispute his Truthfulness.  Then it seems to me, People, that you we're left with a court saying that negligence, incompetence, et cetera, or confusion over the necessity of giving notice that would be a ground for [pre]clusion.

On the other hand, if I don't preclude counsel, if we go down that road, I think we are in that quagmire, People, because presumably she comes back.

I withdraw my preclusions she comes back and testified to this and your first question is going to be or your second question:  When did you let defense counsel know this and if she says I did at an earlier date and it's different than what he is telling us now, you would be calling Mr. Schurr to [r]ebut that.

That's the concern here, People.  I think it's almost identical to what Judge Benitez was faced with.  I'm not sure how we get around this.

(Tr. 856-65, emphasis added.)

Defense counsel Schurr explained that his investigator, Bob Jones, spoke to Hoo-Hing once before Schurr met with her, but Jones did not inform Schurr of the substance of the conversation.  (Tr. 869-76.)  Justice Tallmer directed Schurr to bring Jones in for questioning.  (Tr. 876-77.)  Schurr said that the only information he had about Hoo-Hing was that Batchilly had told him "he saw her afterwards."  (Tr. 876-881.)  Justice Tallmer asked Schurr whether he had learned of the time frame during which Batchilly had allegedly seen Hoo-Hing and compared it with the time of the alleged rape.  (Tr. 881-82.)  Schurr responded:

I didn't know the time frame.  That's why I did not get a chance to speak to this witness and I could not.  I had no knowledge until I actually saw her face-to-face.  Many witnesses cancelled on us so many times, and I was not able to get a hold of these witnesses.

(Tr. 882-83.)

H:\OPIN\BATCHILLY

Citing <u>Noble</u> v. <u>Kelly</u>, 246 F.3d 93 (2d Cir.), <u>cert. denied</u>, 534 U.S. 886, 122 S. Ct. 197 (2001), <u>Taylor</u> v. <u>Illinois</u>, 484 U.S. 400, 108 S. Ct. 646 (1988), and <u>People</u> v. <u>Walker</u>, 294 A.D.2d 218, 743 N.Y.S.2d 403 (1st Dep't), <u>appeal denied</u>, 98 N.Y.2d 772, 752 N.Y.S. 2d 13 (2002), Justice Tallmer stated that regardless of whether Schurr willfully failed to analyze when Batchilly saw Hoo-Hing or whether Batchilly failed to inform Schurr of his alibi, "it would seem . . . that the alibi should still be precluded."  (Tr. 883-84.)

Via speaker phone, Jones informed Justice Tallmer that he had spoken with Hoo-Hing by phone "a little over a week ago" and did not attempt to contact Hoo-Hing earlier because "[i]t surfaced late in the investigation."  (Tr. 884-85, 887, 893.)  Although Jones did not take notes during his conversation with Hoo-Hing, he remembered that Hoo-Hing said "that she knew [Batchilly] and that he came by Applebees sometime around 12:30, one o'clock in the morning and he spent some time with her until, I guess, about two o'clock, 2:30 in the morning and he dropped her off home." (Tr. 885-86, 894.)   While Jones "appreciat[ed] the significance of this information," he did not inform Schurr that Hoo-Hing was a witness "[w]ho could possibly place [Batchilly] at another place at 12:30" until the day before or the day that Schurr met Hoo-Hing.  (Tr. 886-93.)  Jones explained that he did not inform Schurr right away that Hoo-Hing could provide alibi testimony because he "didn't talk to her like that as an alibi witness.  [He] was looking to see if [Hoo-Hing] spoke to [Batchilly] at any time that night or saw him that night.  [He] wasn't thinking of her as an alibi witness at all."  (Tr. 888, 892.)

Justice Tallmer pointed out that, "applying the federal standard," "the question of counsel's knowledge is subsidiary to the question of the defendant's knowledge." (Tr. 895.) Justice Tallmer noted that Batchilly "obviously has known from day one that he supposedly was in the parking lot with Ingrid [Hoo-Hing] between 12:30 and 1" a.m. and that the alleged rape occurred at 12:30 a.m. (Tr. 895, 897.) After consulting with Batchilly, Schurr responded that Batchilly believed that his December 28, 2001 statement to the police alerted defense counsel to the alibi that Ingrid Hoo-Hing could provide. (Tr. 898-99.) Justice Tallmer replied:

> THE COURT:  Well, that explanation is not going to surface on its face.  It's absurd that if [Batchilly] might have thought that would put you on notice, counsel, but if it didn't, there is no explanation for why he didn't see fit to say:  By the way, during the same period that I allegedly raped Emily Feliciano, I'm at the parking lot in Applebees two hours, an hour-and-a-half talking to a girlfriend or co-worker. That's the explanation, counsel?

> I'm going to stand by my original preclusion under the authority of the First Department case as long and as well as applying the federal standards, counsel.

> . . . .

> [S]o the statement that he made to the police: "And after I went to pick up my friend Ingrid from Applebees." Does not set a time frame either for the drop of[f] of Emily [Feliciano] or the pick up of Ingrid [Hoo-Hing].

> So, counsel's, argument is that itself did not alert him to the existence of a possible alibi witness.

> So if that's the position counsel is taking, and reviewing that statement in itself, People, I think we have to agree there that there is nothing inherent in that statement that would have alerted counsel to the corresponding time frames, but [Batchilly] at all times has had access to the felony complaint.  He is sitting here with a file of all documents.  He had access to all the discovery in laying out the time frame.

He was the one in the best position other than, well, he and Ingrid [Hoo-Hing] were in the best position to know where he allegedly was during the time frame that Emily [Feliciano] claimed he was raping her.

He had to have appreciated the significance, and I could only think that the failure to come forward with this and to supposedly rely upon that, counsel, would pick up the existence of an alibi witness who can clear him from the statement alluding to picking up Ingrid [Hoo-Hing] from Applebees after he dropped Emily [Feliciano] off.  <u>That this is a recent fabrication that has been devised by the defendant to in the face of very strong evidence that has been pre[s]ented by the People here</u>, including the Court's ruling about his attorney's vicarious admissions at arraignment would come in.

So I believe to allow the alibi testimony in under these circumstances with the defendant's full knowledge and failure disclosed and on top of that counsel's failure to investigate and to ask the questions that I believe any reasonable attorney would ask, <u>the clear violations of the alibi statute, the prejudice to the People</u>.

(Tr. 899-901, emphasis added.)   A.D.A. Singer stated that the prosecution would be greatly prejudiced by allowing Hoo-Hing to testify because the prosecution would not be able to interview witnesses or review records to corroborate or discount the alibi.  (Tr. 901-03.)   Justice Tallmer agreed, noting that, had the People known of the alibi evidence, they "would have been able to send out investigators to attempt to corroborate Ingrid [Hoo-Hing]'s own whereabouts, her[ ] timing in terms of her work at Applebees that night.  Possibly any other witness who may have been present in the parking lot, et cetera."  (Tr. 903-04.)   Justice Tallmer concluded:

[N]o adjournment now is going to be able to cure that kind of delay because except for the participants in this case, that night was an innocuous night.  The presence of [Batchilly] talking to a female in the parking lot where he worked would not have been something remarked upon a year later.  Possibly, had timely notice been given, there would have been.

So, for all these reasons, I'm going to stand by my original determination to preclude.

(Tr. 904.)

Defense counsel Schurr argued that an adjournment was a better remedy because Batchilly's constitutional rights to a fair trial were at stake and the prosecutor could speak with Hoo-Hing and check with Applebees.  (Tr. 904-06.)  A.D.A. Singer replied that the People could not locate witnesses and "recreate a scene" to corroborate Hoo-Hing's alibi almost a year after the night in question.  (Tr. 906.)  A.D.A. Singer emphasized that Batchilly "knew the timing" and the content of Hoo-Hing's testimony since his arrest but inexplicably kept that information to himself.  (Tr. 906-07.)  Justice Tallmer reaffirmed her ruling.  (Tr. 907-08.)

Schurr asked for a short adjournment, to at "least give it a try," but Justice Tallmer refused:

> It seems very clear to me here that your client is playing the system, counsel, and that this is a fabrication that he has come up with, counsel.
>
> If there was some truth to it certainly he would have brought it to somebody's attention, yourself, the police, anybody's attention, counsel, other than the jury's attention on the defense case.

(Tr. 908, emphasis added.)

Schurr moved for a mistrial because Justice Tallmer's preclusion of Hoo-Hing's testimony "signal[ed] very clearly to the jury . . . that [Batchilly] called a witness that is not believable."  (Tr. 909.)  Justice Tallmer denied the mistrial motion:

> By that reasoning, a mistrial would have been required in all of these cases where there was preclusion, counsel.  Because, presumably, in all of or most of them it's when the witness is testifying that the alibi testimony comes to light, counsel.

In any event, counsel, I told the jury that for reasons that need not concern them I had no knowledge of her proposed testimony until you put her on the stand.

You knew, counsel, at least on that morning of her testimony [what] she was going to say, but you didn't see fit to disclose it to myself or the district attorney.

For you now to claim prejudice because I struck her testimony after she already had given a portion, it prejudices the People's case.

(Tr. 909-10.)[2]

### The People's Rebuttal Case

In December 2001, Feliciano resided at a Bronx shelter for homeless women and domestic violence victims that looked like an apartment building. (Adriene Paniagua[3]: Tr. 980-82, 991; Feliciano: Tr. 1003-04.)  The building had an extensive security system, including a security guard on duty twenty-four hours a day and security cameras throughout. (Paniagua: Tr. 983-85, 989, 998.)  The building required residents to sign a log book at the security desk every time they entered or exited. (Paniagua: Tr. 985-86, 989; Feliciano: Tr. 1004, 1009-10.)  The log book showed that on December 27, 2001, Feliciano signed out of the building for the first time at 2:50 p.m. and signed back in at 1:00 a.m. (Paniagua: Tr. 993-96; Feliciano: Tr. 1006-07; Dkt. No. 13: ADA Whetstone Aff. Ex. 10: Log Book.)  The log book also showed that she left the building with the police and EMS at 1:35 a.m. (Paniagua: Tr. 996-97; Feliciano: Tr. 1007; Log Book.)

---

[2]     During the People's rebuttal, Schurr told Justice Tallmer that Batchilly had just informed him that Batchilly had contacted Hoo-Hing earlier, but that Hoo-Hing had been "uncooperative" initially. (Tr. 978-79.)

[3]     Paniagua was the "program and shelter director" at Feliciano's residence. (Paniagua: Tr. 980-81.)

Konrad Robert, the Red Lobster General Manger, testified that Feliciano's Red Lobster time card showed that on December 27, 2001, she clocked in at 4:00 p.m. and out at 11:50 p.m.  (Robert: Tr. 965-66, 972, 975.)  Robert also stated that, while it violates Red Lobster policy for employees to drink during or after their shifts, it does occur.  (Robert: Tr. 973-75.)

**Verdict and Sentence**

On November 27, 2002, the jury acquitted Batchilly of rape but convicted him of first degree sexual abuse and second degree unlawful imprisonment.  (Verdict: Tr. 1175-77.)

On December 20, 2002, Batchilly was sentenced to concurrent terms of six years for sexual abuse and one year for unlawful imprisonment, along with three years of post-release supervision.  (See Dkt. No. 13: ADA Whetstone Aff. Ex. 13: Sentencing Transcript at 13-15.)

**Batchilly's Direct Appeal**

Represented by new counsel (the Legal Aid Society), Batchilly's appeal to the First Department claimed that:  (1) Justice Tallmer violated Batchilly's Sixth Amendment right to present a defense when she precluded Hoo-Hing's testimony because of trial counsel's failure to provide a timely alibi notice (Dkt. No. 13: ADA Whetstone Aff. Ex. 14: Batchilly 1st Dep't Br. at 50-64); (2) trial counsel was ineffective for "fail[ing] to undertake any investigation in this case until the eve of trial, thus depriving [Batchilly] of the opportunity to present an alibi witness" (Batchilly 1st Dep't Br. at 64-68); and (3) Batchilly's sentence was excessive (Batchilly 1st Dep't Br. at 68-69).

On October 5, 2006, the First Department unanimously affirmed Batchilly's conviction, People v. Batchilly, 33 A.D.3d 360, 821 N.Y.S.2d 597 (1st Dep't 2006), holding in full:

The court properly exercised its discretion in precluding proposed alibi testimony for failure to comply with the notice requirement of CPL 250.20 (1) where, late in the trial, defense counsel first requested permission to file an alibi notice. The record supports the court's express findings that the alibi was a recent fabrication and that the failure to provide timely notice was the product of willful conduct by defendant, personally, that was motivated by his desire to obtain a tactical advantage. Defendant could have provided timely alibi notice long before the trial since he would have known from the time of his arrest whether he was with anyone at the time of the crime. Although defendant referred to the proposed witness in his statement to the police, he provided no time frame for the relevant events, and we find unpersuasive defendant's present argument that a potential alibi could be discerned from geographical aspects of the statement. We note that, at his arraignment, his then-attorney mentioned various witnesses who would support defendant, but never referred to this witness. Even though defendant and the witness had been friends and coworkers from the beginning of the case, she was a late addition to defendant's witness list because he only informed counsel about her the day before jury selection began. At that point, he still never told counsel that she would provide an alibi. Since defendant knew from the inception of the case whether she was a witness at the time of the crime, the record indicates that her proposed testimony was a product of recent fabrication.

Moreover, regardless of whether the People needed to demonstrate prejudice, the record establishes that they would have been prejudiced. Even if witnesses from the restaurant where defendant met the proposed witness could have been located, their recollection of the precise time defendant arrived there a year earlier would be have been unlikely. Accordingly, it would have been futile for the court to have granted the People an adjournment as an alternative to preclusion (see CPL 250.20 [3]).

In any event, were we to find that the court erred in precluding the alibi testimony, we would find the error to be harmless. The proposed alibi was undermined by documentary evidence concerning the victim's movements at the time in question, and there is no reasonable possibility that the alibi testimony would have affected the verdict.

Similarly, to the extent the record permits review, we find that defendant received effective assistance under the state and federal standards. Counsel could have reasonably relied on his client to inform him that he had an alibi. Even if we were to conclude that, with the information available concerning the witness in question, a reasonably competent attorney would have contacted her earlier, we

would find that any such omission did not deprive defendant of a fair trial or cause him any prejudice, particularly in light of the weakness of the alibi, as previously noted.

We perceive no basis for reducing the sentence.

<u>People</u> v. <u>Batchilly</u>, 33 A.D.3d at 361-62, 821 N.Y.S.2d at 598-99 (citations omitted).

On February 13, 2007, the New York Court of Appeals denied leave to appeal.

<u>People</u> v. <u>Batchilly</u>, 8 N.Y.3d 878, 832 N.Y.S.2d 490 (2007).

## **<u>Batchilly's C.P.L. § 440 Motion</u>**

On or about July 2, 2007, Batchilly filed a pro se C.P.L. § 440 motion to vacate the judgment. (<u>See</u> Dkt. No. 13: ADA Whetstone Aff. Ex. 15: Batchilly 440 Motion.) Batchilly argued that:  (1) Motta and Irma Feliciano must have testified falsely about Feliciano's injuries because neither Dr. Klie, EMS or the police mentioned any of Feliciano's injuries besides the bite mark (Batchilly 440 Motion at 8-9; Whetstone Aff. Ex. 15: Batchilly Notice of 440 Motion ¶ (1)(A)); (2) Motta testified falsely about the time that Feliciano arrived at her apartment (Batchilly 440 Motion at 8-9); (3) Det. Marchman testified falsely about being the only arresting officer because he "needed to cover up for det. GONZALEZ and det. COLON who placed [Batchilly] under intense[] interrogation during the transportation process without giving [him] any MIRANDA WARNING and the content of the interrogation was report[ed] to det. MARCHMAN who used it to make [Batchilly] elicit[ ]an incriminating respo[n]se which was [Batchilly's] written statement" (Batchilly 440 Motion at 9-10, 48-50); (4) "the prosecutor introduced important (material) evidence that the prosecutor knew at the time of trial was false" (Batchilly 440 Motion at 11-12, 37-45;

Batchilly Notice of 440 Motion ¶¶ (1)(B)-(C)); (5) Batchilly was denied the right to testify before the grand jury (Batchilly 440 Motion at 13-15; Batchilly Notice of 440 Motion ¶ (1)(D)); (6) the trial court should have precluded Batchilly's written and oral statements because Batchilly did not receive Miranda warnings (Batchilly 440 Motion at 15-22, 48-51); (7) the prosecutor violated Brady v. Maryland by withholding the DNA evidence from the bite mark on Feliciano's lip and the pants that Feliciano wore on December 27, 2001 (Batchilly 440 Motion at 22-28); and (8) his counsel was ineffective for failing to: (a) ensure that he was able to testify before the grand jury (Batchilly 440 Motion at 11-12); (b) "expose the 'BAD FAITH' of the prosecution to the Trial Court" (Batchilly 440 Motion at 45); (c) request a "missing witness charge" when only one of three officers involved in Batchilly's arrest testified (Batchilly 440 Motion at 28-29, 44-45; Batchilly Notice of 440 Motion ¶ (1)(E)); (d) consult or call a medical expert (Batchilly 440 Motion at 29-37); (e) resign from the case (Batchilly 440 Motion at 46-48); and (f) answer Batchilly's phone calls (Batchilly 440 Motion at 46).

On January 2, 2008, the District Attorney's Office response to Batchilly's motion included an affidavit from defense counsel Schurr. (See ADA Whetstone Aff. Ex. 1: Schurr Aff.) Schurr stated in his affidavit that, when Batchilly retained him, he asked Batchilly whether Batchilly thought his right to testify before a grand jury had been violated. (Schurr Aff. ¶ 5.) Batchilly responded that his rights "had not been violated because he knowingly and voluntarily declined to testify" at the time he was represented by prior counsel. (Schurr Aff. ¶¶ 4-5.)

In response to Batchilly's claim that Schurr failed to request a missing witness charge, Schurr maintained that Batchilly "was never questioned nor did he make any statements regarding the accusations to detectives Gonzalez and Colon.  Only detective Marchman gave defendant his Miranda warnings and interrogated him.  No other officers were present.  Therefore, there was no legal basis to request a missing witness charge."  (Schurr Aff. ¶ 6.)

In response to Batchilly's claim that Schurr failed to return Batchilly's phone calls, Schurr claimed that "the opposite is true in that [Batchilly] failed to maintain contact with me and my investigator for a long time period."  (Schurr Aff. ¶ 8.)  Schurr stated that Batchilly ignored his phone calls and letters, that Batchilly's phone was disconnected on multiple occasions, and that Batchilly gave him witness information in an "untimely and incomplete manner making it nearly impossible to locate and speak with them."  (Schurr Aff. ¶ 8.)  The witnesses also "failed to cooperate by moving to . . . undisclosed addresses, not returning calls, moving out of New York State, not having a telephone or being given incorrect telephone numbers."  (Schurr Aff. ¶ 8.)  Schurr only met the defense witnesses, including Hoo-Hing, the night before their testimony because "[o]nly as the trial began did [defense investigator] Mr. Jones and [Schurr], after pleading with [Batchilly], get more information that finally allowed meeting [the witnesses] one evening before their testimony."  (Schurr Aff. ¶ 8.)

Schurr did not consult or call a medical expert because the medical records, which indicated that Feliciano immediately reported the rape and that she had cheek, nose, neck, lip and chest injuries, were consistent with rape.  (Schurr Aff. ¶ 9.)  "To have consulted and called a defense

medical expert would have further corroborated the prosecution's case and prejudiced" Batchilly. (Schurr Aff. ¶ 9.)

On May 14, 2008, Justice Tallmer denied Batchilly's § 440 motion.  (ADA Whetstone Aff. Ex. 22: Justice Tallmer 440 Decision.)  As to Batchilly's claim that the "People relied upon fraudulent testimony," Justice Tallmer noted that that claim was based upon:  (1) "[a]lleged inconsistencies between the medical records and the testimony of the outcry witnesses as to [Feliciano]'s injuries"; (2) "[t]he alleged implausibility of the time line testified to by the People's witnesses"; and (3) "[a]lleged inconsistencies between police paperwork and police testimony." (Justice Tallmer 440 Decision at 12.)  Justice Tallmer denied the claim because "there were sufficient facts on the record to raise these contentions on direct appeal and there is no justification for [Batchilly]'s failure to include these claims in his [denied] appeal."  (Justice Tallmer 440 Decision at 12.)

As to Batchilly's grand jury claim, Justice Tallmer found that Batchilly had instructed counsel Schurr not to make such a motion.  (Justice Tallmer 440 Decision at 12-13.)

Justice Tallmer ruled that C.P.L. § 440.10(2) "mandates the denial" of Batchilly's Miranda claim because Batchilly "had every opportunity to challenge the suppression ruling on his direct appeal but failed to raise this ground." (Justice Tallmer 440 Decision at 13.)  Justice Tallmer denied Batchilly's Brady claim because Brady "only requires the People to turn over exculpatory evidence.  It does not require the People to call every possible witness or introduce every possible piece of evidence."  (Justice Tallmer 440 Decision at 13.)

Justice Tallmer denied Batchilly's claim that Schurr was ineffective for failing to file a C.P.L. § 190.50 motion "because counsel has provided a reasonable explanation of his actions and there would have been no merit to such a motion, inasmuch as defendant expressly waived his right to testify before the grand jury." (Justice Tallmer 440 Decision at 12-13.) Justice Tallmer denied Batchilly's claim that counsel was ineffective for failing to file a missing witness charge because Batchilly could have "made this argument on appeal" and, in any event, Schurr's affidavit sufficiently articulated that "there was no legal basis for such a charge." (Justice Tallmer 440 Decision at 14.) Likewise, Justice Tallmer denied Batchilly's claim that Schurr was ineffective for failing to call a medical expert because Schurr's decision not to call a medical expert was a "reasonable tactical decision" in light of the medical records' consistency with Feliciano's allegations. (Justice Tallmer 440 Decision at 14.)

Justice Tallmer denied Batchilly's claim that Schurr was ineffective for failing to "investigate and call" Hoo-Hing because Batchilly had already raised his record-based claim on direct appeal and the First Department had "considered and rejected" it. (Justice Tallmer 440 Decision at 14-15.) Justice Tallmer stated that, in any event, Batchilly's claim was meritless because "[c]ounsel can hardly be faulted for failing to investigate a witness who was prepared to give a false alibi, concocted by [Batchilly] after he was confronted with overwhelming proof of his guilt." (Justice Tallmer 440 Decision at 15.) Justice Tallmer further noted that despite the overwhelming proof of Batchilly's guilt, the jury did not convict him on the top count (of rape), carrying a possible

25 year sentence, and the "fact that defense counsel was able to achieve this result refutes any claim of ineffective assistance of counsel." (Justice Tallmer 440 Decision at 15.)

On August 19, 2008, the First Department denied leave to appeal from Justice Tallmer's denial of Batchilly's C.P.L. § 440 motion. (Dkt. No. 13: ADA Whetstone Aff. Ex. 23: 8/19/08 1st Dep't Order.)

**Batchilly's Federal Habeas Corpus Petition**

Batchilly's pro se habeas petition asserts that: (1) Justice Tallmer violated Batchilly's Sixth Amendment right to present a defense by precluding Ingrid Hoo-Hing's alibi testimony (Dkt. No. 3: Pet. at 6, 41-52); (2) Batchilly was denied his right to testify before the grand jury (Pet. at 6, 83-92); (3) Batchilly's "Miranda rights were violated" (Pet. at 6, 37-38, 41, 92-94, 117-18, 126); (4) the prosecutor's "use of Perjured Testimony" violated Batchilly's due process rights (Pet. at 7, 39-40, 108-16); (5) the prosecutor violated Brady v. Maryland by withholding DNA evidence from the bite mark on Feliciano's lip and failing to introduce into evidence the pants that Feliciano wore on December 27, 2001 (Pet. at 38-39, 98-108); (6) Batchilly's counsel was ineffective for failing to: (a) investigate Hoo-Hing's alibi and timely serve alibi notice (Pet. at 6, 11, 16, 23, 41-63, 81-82); (b) request a missing witness charge (Pet. at 6, 23, 26-27, 63-69, 81-82, 126-27); (c) consult or call a medical expert to testify (Pet. at 6, 23, 27-31, 69-77, 81-82); and (d) ensure that Batchilly testify before the grand jury and file a motion to dismiss based on defective grand jury proceedings (Pet. at 34, 81-82, 83-92); and (7) Batchilly's sentence was excessive (Pet. at 7, 41, 118-19).

## ANALYSIS

I.   **THE AEDPA REVIEW STANDARD**

Before the Court can determine whether Batchilly is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[4]

---

[4]   See also, e.g., Knowles v. Mirzayance, 129 S. Ct. 1411, 1418 (2009); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (continued...)

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 404-05, 120 S. Ct. at 1519.[5/]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 412, 120 S. Ct. at 1523.[6/]  "That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." <u>Kennaugh</u> v.

---

[4/]       (...continued)
           (2002)).

[5/]       Accord, <u>e.g.</u>, <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>Jones</u> v. <u>Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000); <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d 113, 125 (2d Cir. 2000), <u>cert. denied</u>, 532 U.S. 943, 121 S. Ct. 1404 (2001); <u>Clark</u> v. <u>Stinson</u>, 214 F.3d 315, 320 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[6/]       Accord, <u>e.g.</u>, <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d 145, 153-54 (2d Cir. 2009); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d 160, 164 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 642 (2009); <u>Carey</u> v. <u>Musladin</u>, 549 U.S. 70, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed]' clearly established Federal law.'"); <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); <u>Hargett</u> v. <u>Giambruno</u>, 291 Fed. Appx. 402, 403 (2d Cir. 2008); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d 587, 591 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 1047, 124 S. Ct. 2171 (2004); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d 1197, 1200 (2d Cir. 2002); <u>Yung</u> v. <u>Walker</u>, 341 F.3d 104, 109-110 (2d Cir. 2003); <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d 36, 42 (2d Cir.), <u>cert. denied</u>, 537 U.S. 909, 123 S. Ct. 251 (2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d 178, 184 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 309 (2d Cir. 2001).

Miller, 289 F.3d at 42; accord, e.g., Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied,

129 S. Ct. 1312, 2009 WL 425166 at *1 (Feb. 23, 2009).  "A petitioner can not win habeas relief

solely by demonstrating that the state court unreasonably applied Second Circuit precedent."  Yung

v. Walker, 341 F.3d at 110; accord, e.g., DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . .  A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[7/]

> In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application'

clause, a federal habeas court may grant the writ if the state court identifies the correct governing

---

[7/]   Accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court.") (quotation omitted); Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 123 S. Ct. at 1173-74; Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009); Dunlap v. Burge, 583 F.3d at 164; Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; DelValle v. Armstrong, 306 F.3d at 1200; Yung v. Walker, 341 F.3d at 109; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[8/]  However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522.  The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id.</u>[9/]  Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>,

---

[8/]     <u>Accord</u>, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. 823, 831 (2009); <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 87 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 739 (2009); <u>Jones</u> v. <u>West</u>, 555 F.3d 90, 96 (2d Cir. 2009); <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1257, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[9/]     <u>See also</u>, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of federal law was not unreasonable."); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d at 87-88; <u>Jones</u> v. <u>West</u>, 555 F.3d at 96; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

529 U.S. at 409, 120 S. Ct. at 1521.[10/]  "Objectively unreasonable" is different from "clear error."

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  This is a

"substantially higher threshold" than incorrectness.  Knowles v. Mirzayance, 129 S. Ct. at 1420.[11/]

"[T]he range of reasonable judgment can depend in part on the nature of the relevant rule."

Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149.[12/]  "Even if the state court issues a

---

[10/]    Accord, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti, 537 U.S. at 25-27, 123 S. Ct. at 360-61; Dunlap v. Burge, 583 F.3d at 165; Davis v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 522 U.S. 836, 128 S. Ct. 75 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 128-29.

[11/]    However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).; accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the "unreasonable application 'standard falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v. Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

[12/]    The Supreme Court explained:

        [T]he range of reasonable judgment can depend in part on the nature of the relevant
                                                                (continued...)

decision 'contrary to' clearly established Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir.), cert. denied, 128 S. Ct. 2910 (2008).

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[13]

---

[12]   (...continued)
rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149; accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1426 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157; Dunlap v. Burge, 583 F.3d at 166; Hawkins v. Costello, 460 F.3d at 243.

[13]   Accord, e.g., Davis v. Grant, 532 F.3d at 140-41; Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and (continued...)

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519. "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to the record in an unreasonable manner." Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); accord, e.g., Georgison v. Donelli, 588 F.3d at 154.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here,

---

[13]/    (...continued)
extending it is not always clear.  Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'"[14]   Even if the federal court holds an evidentiary hearing, the deferential AEDPA review standard applies.  Wilson v. Mazzuca, 570 F.3d at 501-02 ("Where . . . a district court has performed additional fact finding, the court must then ask whether the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' . . . in light of any newly-discovered facts. . . . [W]e are directed to apply the same AEDPA standard that would otherwise be in force, now in light of the new information that has been obtained through a § 2254(e) hearing.").

        Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 549 U.S. 1133, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues

---

[14]        See also, e.g., Mosby v. Senkowski, 470 F.3d at 519; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"  "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254."  Moreover, "if any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference.").

laid out in <u>Coleman</u>, <u>Quirama</u> and <u>Sellan</u>" – that is, "(1) the face of the state-court opinion,

(2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in

similar circumstances." <u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145 & n.16; <u>accord</u>, <u>e.g.</u>, <u>Clark</u> v. <u>Perez</u>, 510

F.3d 382, 394 (2d Cir.), <u>cert. denied</u>, 129 S. Ct. 130 (2008).  Using these three factors, the court

should classify the decision as either:

> (1)      fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2)      fairly appearing to rest primarily on state procedural law.
>
> Absent a clear and express statement of reliance on a state procedural bar, the <u>Harris</u> presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim.  Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d).  The <u>Harris</u> presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar.  Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar.  No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.
>
> The effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised.  The middle ground . . . does not exist.

<u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145-46 (citations & fns. omitted); <u>accord</u>, <u>e.g.</u>, <u>Hawkins</u> v. <u>Costello</u>,

460 F.3d at 242 ("In <u>Jimenez</u> v. <u>Walker</u>, we recently made clear that when a state court rejects a

petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the

adjudication rested on the merits.").  Of course, "[i]f there is no [state court] adjudication on the

merits [and no procedural bar], then the pre-AEDPA, de novo standard of review applies." Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); see also Wilson v. Mazzuca, 570 F.3d at 500 n.8; Jimenez v. Walker, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); accord, e.g., Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220. "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Brown v. Alexander, 543 F.3d at 100; Lynn v. Bliden, 443 F.3d at 246-47.

## II. BATCHILLY'S CLAIM THAT THE TRIAL COURT VIOLATED HIS SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE BY PRECLUDING HOO-HING'S ALIBI TESTIMONY SHOULD BE DENIED

Batchilly claims that Justice Tallmer violated his Sixth Amendment right to present a defense by precluding Hoo-Hing's alibi testimony due to trial counsel's failure to file a timely alibi notice. (Dkt. No. 3: Pet. at 6, 41-52.)[15/]

---

[15/]    Pursuant to C.P.L. § 250.20(1), the prosecutor may demand within twenty days after arraignment that defendant file "a notice of alibi" within eight days if defendant "intends to (continued...)

Citing <u>Taylor</u> v. <u>Illinois</u>, 484 U.S. 400, 414-15, 108 S. Ct. 646, 655-56 (1988), and

<u>Noble</u> v. <u>Kelly</u>, 246 F.3d 93 (2d Cir.), <u>cert. denied</u>, 543 U.S. 886, 122 S. Ct. 197 (2001), the First

Department held that Justice Tallmer "properly exercised [her] discretion in precluding proposed alibi

testimony" and that "[t]he record support[ed] the court's express findings that the alibi was a recent

fabrication and that the failure to provide timely notice was the product of willful conduct by

defendant, personally, that was motivated by his desire to obtain a tactical advantage." <u>People</u> v.

<u>Batchilly</u>, 33 A.D.3d 360, 360-61, 821 N.Y.S.2d 597, 598 (1st Dep't 2006).  The First Department

reasoned that Batchilly "knew from the inception of the case" whether he was with his friend and co-

worker Ingrid Hoo-Hing at the time of the crime, but did not inform counsel about her until the day

before jury selection began. <u>People</u> v. <u>Batchilly</u>, 33 A.D.3d at 361, 821 N.Y.S.2d at 598.  Even when

Batchilly informed counsel about Hoo-Hing, "he still never told counsel that she would provide an

---

15/      (...continued)
offer a trial defense that at the time of the commission of the crime charged he was at some
place or places other than the scene of the crime, and to call witnesses in support of such
defense."  C.P.L. § 250.20(1).  The "notice of alibi" must "recit[e]" the "place" where
defendant claims to have been during the time in question and the witnesses "upon whom
[defendant] intends to rely.  For good cause shown, the court may extend the period for
service of the notice."  C.P.L. § 250.20(1).  If such notice is not given, the alibi witness will
be precluded:

    If at the trial the defendant calls such an alibi witness without having served
the demanded notice of alibi, . . . the court may exclude any testimony of such
witness relating to the alibi defense. The court may in its discretion receive such
testimony, but before doing so, it must, upon application of the people, grant an
adjournment not in excess of three days.

C.P.L.  § 250.20(3).

alibi." People v. Batchilly, 33 A.D.3d at 361, 821 N.Y.S.2d at 598.  The First Department discounted Batchilly's argument "that a potential alibi could be discerned from geographical aspects of his statement" to the police because "[a]lthough [Batchilly] referred to the proposed witness in his statement to the police, he provided no time frame for the relevant events."  People v. Batchilly, 33 A.D.3d at 361, 821 N.Y.S.2d at 598.

The First Department further held that "regardless of whether the People needed to demonstrate prejudice, the record establishes that they would have been prejudiced."  People v. Batchilly, 33 A.D.3d at 361, 821 N.Y.S.2d at 599.  Even if restaurant witnesses could be located, their "recollection of the precise time defendant arrived there a year earlier would be have been unlikely."  People v. Batchilly, 33 A.D.3d at 361, 821 N.Y.S.2d at 599.   Thus, the First Department held that an adjournment as an "alternative to preclusion" would have proved "futile."  People v. Batchilly, 33 A.D.3d at 361, 821 N.Y.S.2d at 599.

The First Department determined that, "in any event," even if Justice Tallmer "erred in precluding the alibi testimony," the error was "harmless" because the proposed alibi "was undermined by documentary evidence concerning the victim's movements at the time in question, and there is no reasonable possibility that the alibi testimony would have affected the verdict."  People v. Batchilly, 33 A.D.3d at 361, 821 N.Y.S.2d at 599.

### A.    The Legal Standard

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."  U.S. Const.

amend. VI.   In interpreting that text, "the Supreme Court has made clear [that] . . . . a criminal defendant has a right, grounded in the Compulsory Process Clause, to present witnesses in his defense." Wade v. Herbert, 391 F.3d 135, 140-41 (2d Cir. 2004) (citing Taylor v. Illinois, 484 U.S. 400, 408, 108 S. Ct. 646, 652 (1988) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense")); see also, e.g., Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045 (1973) ("The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.").  The Supreme Court has also made clear, however, that "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly." Taylor v. Illinois, 484 U.S. at 410, 108 S. Ct. at 653.  As the Supreme Court has explained:

> The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.

Taylor v. Illinois, 484 U.S. at 410-11, 108 S. Ct. at 654; see also, e.g., Chambers v. Mississippi 410 U.S. at 302, 93 S. Ct. at 1049 (1973) ("In the exercise of [the right to present witnesses], the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."); Wade v. Herbert, 391 F.3d at 141 (The right to present witnesses "exists only as part of the adversary process, and

defense witnesses may be limited or even excluded as a sanction for the violation of valid discovery rules.").

In Taylor, on the second day of trial, after the two principal prosecution witnesses had testified, defense counsel moved to add extra witnesses to his witness list.  Taylor v. Illinois, 484 U.S. at 403, 108 S. Ct. at 650.   Defense counsel represented that although defendant had told him about the witnesses, counsel had been unable to locate the witnesses.  Taylor v. Illinois, 484 U.S. at 404 & n.5, 108 S. Ct. at 650 & n.5.   The following day, the Court discovered that defense counsel met the witness the week before the trial began.  Taylor v. Illinois, 484 U.S. at 405, 108 S. Ct. at 651.

The Supreme Court in Taylor declined to "draft a comprehensive set of standards to guide the exercise of discretion in every possible case."  Taylor v. Illinois, 484 U.S. at 414, 108 S. Ct. at 656.  Instead,

> courts must weigh "the defendant's right to offer the testimony of witnesses in his favor" against the likelihood that improperly offered testimony will subvert "[t]he integrity of the adversary process."   The [Supreme] Court observed that discovery rules serve the important interest of "minimiz[ing] the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony."   It also noted that it was "reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed."

Wade v. Herbert, 391 F.3d at 141 (quoting Taylor v. Illinois, 484 U.S. at 411-12, 414-15, 108 S. Ct. at 651).

Ultimately, the Supreme Court in Taylor upheld the conviction, ruling that a trial court may preclude a defense witness' testimony "where notice was untimely if counsel's explanation for failing to provide timely notice 'reveals that the omission was willful and motivated by a desire to

obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence.'" Brown v. Miller, 185 Fed. Appx. 25, 26 (2d Cir.) (quoting Taylor v. Illinois, 484 U.S. at 415, 108 S. Ct. at 656), cert. denied, 549 U.S. 1120, 127 S. Ct. 938 (2007).  The Taylor Court further emphasized that exclusion is an appropriate sanction for "willful misconduct," "[r]egardless of whether prejudice to the prosecution could have been avoided" because "[m]ore is at stake than possible prejudice to the prosecution. We are also concerned with the impact of this kind of conduct on the integrity of the judicial process itself." Taylor v. Illinois, 484 U.S. at 416-17, 108 S. Ct. at 657.  Nevertheless, the Supreme Court instructed that "[i]t may well be true that alternative sanctions are adequate and appropriate in most cases." Taylor v. Illinois, 484 U.S. at 413, 108 S. Ct. at 655.

In interpreting Taylor, the Second Circuit has concluded that "where prejudice to the prosecution can be minimized with relative ease, a trial court's exclusion of alibi testimony must be supported by a finding of some degree of willfulness in defense counsel's violation of the applicable discovery rules." Noble v. Kelly, 246 F.3d 93, 100 n.3 (2d Cir.), cert. denied, 534 U.S. 886, 122 S. Ct. 197 (2001); see also, e.g., Bohan v. Kuhlmann, 234 F. Supp. 2d 231, 249, 276 (S.D.N.Y. 2002) ("[I]n Noble the Second Circuit did not state that, under the facts of that case, a short adjournment would have eliminated all prejudice to the prosecution. It merely stated that the prejudice to the prosecution could have been minimized with relative ease. . . .  [T]he trial court could have minimized any prejudice to the prosecution with a short adjournment, and therefore some finding of willfulness was necessary."), aff'd, 66 Fed. Appx. 277 (2d Cir. 2003), cert. denied, 540 U.S. 1213, 124 S. Ct. 1420

(2004); Cruz v. Artuz, No. 97-CV-2508, 2002 WL 1359386 at *11 (E.D.N.Y. June 24, 2002) ("What can readily be gleaned from Taylor and Noble is that remedies less sever than total exclusion, such as continuances, need not be considered by the state court in the face of a properly supported willfulness finding.").  The Second Circuit in Noble declined to "decide whether, and to what extent, a finding of willfulness is required in every case." Noble v. Kelly,  246 F.3d at 100 n.3.  Yet in a later decision, the Second Circuit stated that a finding of willfulness

> is not determinative on the issue of preclusion. The Supreme Court appears to have identified the circumstances present in Taylor as illustrative rather than definitive of factors supporting preclusion.  Thus, we do not understand the law to establish clearly that the absence of similar circumstances invariably bars preclusion.
>
>  . . . . In short, state preclusion rules may not be applied mechanically; rather "a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify," or "to present witnesses in his own defense."

Pulinario v. Goord, 118 Fed. Appx. 554, 557 (2d Cir. 2004) (citations omitted).

Several circuits have interpreted Taylor to require a balancing test rather than a finding of "willful misconduct" as a prerequisite to preclusion.  See, e.g., Young v. Workman, 383 F.3d 1233, 1239 (10th Cir. 2004) ("[T]he [Supreme] Court made it clear in Taylor that while willfulness and seeking of tactical advantage justified exclusion, it was 'neither necessary nor appropriate . . . to attempt to draft a comprehensive set of standards to guide the exercise of [a court's] discretion [in ordering the exclusion of evidence] in every possible case.'") (quoting Taylor v. Illinois, 484 U.S. at 414, 108 S. Ct. at 656); United States v. Nelson-Rodriguez, 319 F.3d 12, 37 (1st Cir.) ("This court has never restricted the application of the sanction of exclusion to discovery violations

that are willful or intended to gain a tactical advantage."), cert. denied, 539 U.S. 928, 123 S. Ct. 2590 (2003); United States v. Portela, 167 F.3d 687, 705 n.16 (1st Cir.) ("Some circuits have explicitly or implicitly held that, under Taylor, only willful discovery violations justify exclusion.  We, however, have never held that willfulness is the sole predicate of an exclusionary sanction.") (citations omitted), cert. denied, 528 U.S. 917, 120 S. Ct. 273 (1999); Tyson v. Trigg, 50 F.3d 436, 445 (7th Cir. 1995) ("Although some courts believe nevertheless that the exclusion of a witness or witnesses who would be helpful to the defendant is permissible only if the violation of the discovery order was deliberate, as it was in Taylor itself, other courts disagree.  Our court has yet to take a position on the question, and Taylor itself appears to leave the question open.") (citations omitted), cert. denied, 516 U.S. 1041, 116 S. Ct. 697 (1996).[16/]

---

[16/]    The Ninth Circuit, however, has interpreted Taylor to hold that "[e]xclusion is an appropriate remedy for a discovery rule violation only where 'the omission was willful and motivated by a desire to obtain a tactical advantage.'"  United States v. Finley, 301 F.3d 1000, 1018 (9th Cir. 2002) (quoting Taylor v. Illinois, 484 U.S. at 415, 108 S. Ct. at 656).; see also, e.g., United States v. Verduzco, 373 F.3d 1022, 1033 (9th Cir.) ("Exclusion of a witness as a sanction for a violation of a discovery rule in a criminal trial is generally appropriate only in cases involving willful and blatant violations.") (quotations omitted), cert. denied, 543 U.S. 992, 125 S. Ct. 508 (2004); United States v. Martin, No. Cr. 07-1205(A), 2009 WL 453195 at *2 (C.D. Cal. Feb. 20, 2009) ("[T]he Ninth Circuit has held that '[e]xclusion is an appropriate remedy for a discovery rule violation only where the omission was willful and motivated by a desire to obtain a tactical advantage.'").

Even if a habeas court finds that the state trial court wrongfully precluded an alibi witness, "[t]o obtain habeas relief for the exclusion of defense witnesses, a petitioner must establish that an error was not harmless." Zimmerman v. Burge, 492 F. Supp. 2d 170, 193 (E.D.N.Y. 2007).[17]

The Supreme Court has clarified that, on habeas review, courts must analyze whether a constitutional error was harmless by using the "'the substantial and injurious effect' standard set forth in Brecht [v. Abrahamson], 507 U.S. 619, 113 S. Ct. 1710 [(1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California], 386 U.S. 18, 87 S. Ct. 824 [(1967)]." Fry v. Plier, 551 U.S. 112, 121-22, 127 S. Ct. 2321, 2328 (2007). Under the Brecht standard, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" Fry v. Plier, 551 U.S. at 116, 127 S. Ct. at 2325 (quoting Brecht, 507 U.S. at 631, 113 S. Ct. at 1718). "In assessing an error's likely impact on the jury, 'the Supreme Court has found the following factors to be relevant . . . (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted [or excluded] evidence; (3) the importance of the wrongly admitted [or excluded] testimony; and (4) whether such evidence was cumulative of other properly admitted evidence.' . . . The strength of the prosecution's case, however,

_____

[17]   See also, e.g., United States v. Mizell, 88 F.3d 288, 295 (5th Cir. 1996) ("[O]ur inquiry does not end here, for a violation of a defendant's right to present witnesses on her own behalf does not constitute reversible error if the error was harmless."); Bhuiyan v. Burge, No. 04-CV-744, 2004 WL 1895235 at *5 n.3 (E.D.N.Y. Aug. 25, 2004) (denying petitioner's habeas claim because "[e]ven if the trial court erred in precluding the [alibi] testimony, that error was harmless."); Poo v. Hood, 89 Civ. 7874, 1992 WL 30617 at *5 (S.D.N.Y. Feb. 12, 1992).

'is probably the single most critical factor.'" United States v. Lombardozzi, 491 F.3d 61, 76 (2d Cir. 2007) (quoting United States v. Reifler, 446 F.3d 65, 87 (2d Cir. 2006), & Zappulla v. New York, 391 F.3d 462, 468 (2d Cir. 2004), cert. denied, 546 U.S. 957, 126 S. Ct. 472 (2005)).; see, e.g., A. S. Goldmen, Inc. v. Phillips, 05 Civ. 4385, 2007 WL 2994453 at *4 (S.D.N.Y. Oct. 15, 2007) (in performing harmless error analysis, a court must review the entire record and consider "'the importance of the [ ] wrongly admitted testimony, and the overall strength of the prosecution's case.' When evaluating the importance of the testimony, the court considers whether the wrongly-admitted evidence (1) influenced an issue crucial to the jury's determination; (2) was significantly referenced throughout the prosecution's arguments; and (3) 'was cumulative of other properly admitted evidence.'") (citations omitted); see also, e.g., Jimenez v. Walker, 458 F.3d 130, 147 (2d Cir. 2006) ("[I]n habeas actions, trial errors are subject to harmless-error review [citing Brecht].  If excluded evidence would create otherwise nonexistent reasonable doubt, its exclusion satisfies the 'substantial and injurious' reversible-harm standard."), cert. denied, 549 U.S. 1133, 127 S. Ct. 976 (2007); Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000) ("'[W]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the "omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist."' In a close case, 'additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'  On habeas review, trial errors are subject to lenient harmless error review.  The creation of otherwise non-existent reasonable doubt satisfies the 'substantial and injurious' standard.") (citations omitted); Howard v. McGinnis, 632 F. Supp. 2d 253, 268 (W.D.N.Y. 2009); Snyder v.

58

Smith, No. 04 CV 3781, 2008 WL 1969326 at *3 (E.D.N.Y. May 6, 2008) (Exclusion of evidence

claims are subject to Brecht's harmless-error analysis.); Drake v. Woods, 547 F. Supp. 2d 253, 264-65

(S.D.N.Y. 2008) (Chin, D.J.) ("[T]he Second Circuit has instructed as follows:  whether the exclusion

of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the

omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did

not otherwise exist.") (quotations omitted).

**B.     Application of the Taylor Standard to Batchilly's Claim**

The First Department's decision that Batchilly's conduct was "personally" willful was

a reasonable application of Supreme Court precedent.  The record supports the First Department's

conclusion that Batchilly's failure to provide alibi notice was motivated by his desire to obtain a

tactical advantage.  As the First Department noted, Batchilly knew from the beginning of the case that

he was with Hoo-Hing after dropping Feliciano off at the bus stop, but only "informed counsel about

her the day before jury selection began."  People v. Batchilly, 33 A.D.3d 360, 360-61, 821 N.Y.S.2d

597, 598-99 (1st Dep't 2006).  Batchilly claims now, as he did at trial, that his statement to the police

notified defense counsel about Hoo-Hing's testimony.  (See Dkt. No. 3: Pet. at 41-42, 44; see page

27 above.)  Yet, even if a reasonable attorney would have recognized the possibility of an alibi from

Batchilly's statement, Batchilly should have taken his case seriously enough to ensure that defense

counsel Schurr knew about his alibi long before trial.  Schurr's affidavit provides further support that

Batchilly failed to adequately assist in his own defense.  Schurr's affidavit states that Batchilly ignored

Schurr's phone calls and letters and that Schurr only met the defense witnesses, including Hoo-Hing,

the night before their testimony because "[o]nly as the trial began did [defense investigator] Mr. Jones and [Schurr], after pleading with [Batchilly], get more information that finally allowed meeting [the witnesses] one evening before their testimony." (See page 35 above.)[18] Thus, whether Batchilly intentionally withheld information, or was merely negligent in failing to alert counsel to his alibi until just before jury selection, the First Department's conclusion that Batchilly was motivated by a desire to obtain a tactical advantage is not an unreasonable application of Supreme Court precedent nor has Batchilly rebutted the state court's factual determination that the alibi was a fabrication. See, e.g., Wade v. Herbert, 391 F.3d 135, 142-43 (2d Cir. 2004) (The Appellate Division reasonably could have rejected petitioner's explanation that he did not know where he was on the night of the murder until the alibi witness reminded him many years later and concluded that petitioner 's failure to serve alibi notice either was willful or was due to the "last minute" fabrication of the alibi.  "Petitioner knew he was a suspect within three weeks of the murder, but to avoid police questioning and possible arrest, he fled to Albany and remained there using a false name for three years. In evaluating the state of mind with which petitioner acted after his arrest, it would certainly have been reasonable for the state court to bear in mind his obstructive conduct before his arrest, the improbability under the circumstances that he did not know where he was the night of the murder, and the paucity of evidence

---

[18]   Batchilly's C.P.L. § 440 motion, however, claims that Schurr failed to return his phone calls. (See page 34 above.)  Yet, Batchilly never alleges that he tried to alert Schurr to his alibi early on but was unable to because Schurr did not return his phone calls.  Rather, Batchilly claimed at trial that he did not alert Schurr early on that Hoo-Hing could provide alibi testimony because Batchilly was unable to persuade Hoo-Hing to testify until just before jury selection.  (See page 30 n.2 above.)

supporting his contention. . . . It would certainly have been reasonable for the Appellate Division to conclude . . . that petitioner was engaged in a long continued course of obstruction of justice and that his alibi notice was delivered late either to make its investigation more difficult, or because the alibi was recently fabricated. Such a conclusion would justify the further conclusion that excluding the alibi witness was consistent with Taylor."); Bhuiyan v. Burge, No. 04-CV-744, 2004 WL 1895235 at *3-4 (E.D.N.Y. Aug. 25, 2004) (Upholding the state trial court's preclusion of two alibi witnesses where petitioner timely served alibi notice that one witness would testify that petitioner was at the alibi witness' residence at the time of the crime but did not seek to serve alibi notice until the middle of petitioner's second trial (the first resulted in a hung jury) of two other witnesses who also were supposedly at the residence at the time of the crime.  "[T]he risk that [petitioner] 'found' witnesses 'that really weren't there,' is palpable.  And if [petitioner] did know of the two witnesses and chose not to disclose their existence until the middle of his second trial, that is just the sort of wilful gamesmanship the Supreme Court addressed in Taylor.") (citations omitted); Cruz v. Artuz, No. 97-CV-2508, 2002 WL 1359386 at *12 (E.D.N.Y. June 24, 2002) ("[T]he trial court's findings were clearly tantamount to a factual determination that the defendant's failure to comply with New York's alibi disclosure rule was both willful and motivated by the desire to obtain a tactical advantage, and the record clearly supports this determination; consequently, exclusion was warranted without the need to consider the question of a continuance.  The trial court carefully conducted an examination of the alleged alibi witness and considered all relevant circumstances and the logical inferences to be drawn therefrom. Of paramount significance, if [the alibi witness] was to be believed, [petitioner]

knew that he was with [the alibi witness] in the pool hall [rather than the restaurant where the crime occurred], and certainly realized that [the alibi witness] would be a critical witness. There is simply no plausible reason why [petitioner] never told his trial lawyer about [the alibi witness], and relied upon [the alibi witness] to come forward with this information at the veritable end of the government's case.").

As mentioned above, the Supreme Court has not yet clarified whether a finding of willfulness is necessary or whether trial courts should use a balancing test (see Point II.A above). Under the balancing test approach, weighing "'the defendant's right to offer the testimony of witnesses in his favor' against the likelihood that improperly offered testimony will subvert '[t]he integrity of the adversary process,'" Wade v. Herbert, 391 F.3d at 141, the First Department's decision was not contrary to or an unreasonable application of Supreme Court precedent regardless of whether its willfulness determination was reasonable. Even assuming arguendo that Batchilly's personal conduct did not rise to the level of willfulness, the First Department's conclusion – that the prosecution would have been prejudiced by Hoo-Hing's testimony because any rebuttal witnesses would not have remembered "the precise time" Batchilly arrived at a Applebees a year earlier – was not contrary to or an unreasonable application of Supreme Court precedent.  The Second Circuit's opinion in Wade v. Herbert, 391 F.3d 135 (2d Cir. 2004), a case with similar facts, offers guidance.  In Wade, defense counsel requested leave to file a late alibi notice the day jury selection was set to begin, which was four years after the charged crime and one year after petitioner's arrest.  Wade v. Herbert, 391 F.3d at 138.  The Second Circuit concluded that the "Appellate Division could reasonably have concluded

that the violation irremediably prejudiced the People's ability to rebut the alibi" even though petitioner

mentioned the witness' name in his statement to police upon being arrested.  <u>Wade</u> v. <u>Herbert</u>, 391

F.3d at 144 .  The Second Circuit reasoned:

> The People might have interviewed [the witness] in 1996 once petitioner mentioned
> her name to [police in his statement upon being arrested].  But, because petitioner did
> not disclose any alibi, the People had no reason to believe [the witness] would be an
> alibi witness for petitioner.  Indeed, because New York's rule requires prompt notice
> of alibi, and petitioner had given no notice, the People were entitled to assume that
> [the witness] would <u>not</u> provide an alibi.

<u>Wade</u> v. <u>Herbert</u>, 391 F.3d at 144.  The Second Circuit also determined that "a pretrial adjournment

[would not] have done much to counteract the prejudice. By the time petitioner presented his alibi, . . .

it would likely have been difficult to find a witness who could remember the events from 1993 and

rebut [the alibi witness'] story."  <u>Wade</u> v. <u>Herbert</u>, 391 F.3d at 144; <u>see also</u>, <u>e.g.</u>, <u>Bhuiyan</u> v. <u>Burge</u>,

2004 WL 1895235 at *5 (upholding preclusion of alibi witnesses where petitioner did not notify the

court and the prosecution of the witnesses until the middle of the prosecution's case during his second

trial, in part, because "[t]he prosecution would have been severely prejudiced by the untimely notice

of alibi."); <u>Cruz</u> v. <u>Artuz</u>, 2002 WL 1359386 at *12 (upholding state trial court's preclusion of alibi

testimony based, in part, on trial court's assessment that "the government would be prejudiced because

'[allowing the alibi in] doesn't give them any time for investigation, especially of an incident which

occurred so many years ago at some, apparently, unincorporated, informal social club . . . .'").

         The same rationale applies here.  Although the prosecution could have interviewed

Hoo-Hing based on Batchilly's statement to the police (although there is no evidence that they did),

Batchilly's failure to serve an alibi notice upon the prosecution's request signaled to the prosecution

that it need not investigate any alibi.  (See pages 14, 23, 28 above.)  Furthermore, as in Wade, the

prosecution did not learn of Hoo-Hing's alibi until trial, long after any witnesses would have

remembered something so innocuous as what time Batchilly arrived at Applebees a year earlier.  (See

pages 12-16, 21-30 above.)  Accordingly, the First Department's conclusion that prejudice could not

have been minimized is not an unreasonable application of Supreme Court precedent.

Accordingly, Batchilly's claim that the trial court violated his Sixth Amendment right

to present a defense by precluding Hoo-Hing's alibi testimony should be DENIED.

## III.   BATCHILLY'S CLAIM THAT HE WAS DEPRIVED OF HIS RIGHT TO TESTIFY BEFORE THE GRAND JURY IS NOT COGNIZABLE ON HABEAS REVIEW

Batchilly's claim that he was deprived of his right to testify before the grand jury (see

Dkt. No. 3: Pet. at 6, 83-92) is not cognizable on habeas review.

A jury conviction transforms any defect connected with the grand jury's charging

decision into harmless error because the trial conviction establishes probable cause to indict and also

proof of guilt beyond a reasonable doubt.  See, e.g., United States v. Mechanik, 475 U.S. 66, 68, 106

S. Ct. 938, 940 (1986) ("The petit jury's verdict of guilty beyond a reasonable doubt demonstrates a

fortiori that there was probable cause to charge the defendants with the offenses for which they were

convicted.  Therefore, the convictions must stand despite the [grand jury] rule violation.").[19]  In Lopez

---

[19]   See also, e.g., United States v. Lombardozzi, 491 F.3d 61, 80 (2d Cir. 2007) ("It is well settled that a guilty verdict at trial 'remedies any possible defects in the grand jury indictment.'"); Fernandez v. People, 06 Civ. 7174, 2009 WL 2744903 at *8 (S.D.N.Y. Aug. 28, 2009); Peterson v. New York, 06 Civ. 3369, 2009 WL 935669 at *13 (S.D.N.Y. Apr. 7, 2009) ("[B]ecause [defendant] was convicted after a jury trial at which he testified," (continued...)

v. Riley, the Second Circuit relied on Mechanik, in holding that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in federal court." Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989); see also, e.g., Davis v. Mantello, 42 Fed. Appx. 488, 490-91(2d Cir. 2002) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court.") (citing cases), cert. denied, 538 U.S. 986, 123 S. Ct. 1803 (2003); Fabre v. Taylor, 08 Civ. 5883, 2009 WL 162881 at *18 (S.D.N.Y. Jan. 20, 2009) (Peck, M.J.), report & rec. adopted, 2009 WL 1457167 (S.D.N.Y. May 26, 2009); Bramble v. Smith, 96 Civ. 5905, 1998 WL 395265 at *18 (S.D.N.Y. July 15, 1998) ("claims of error relating to state grand jury proceedings are not cognizable on federal collateral review.").

---

19/      (...continued)
        any error regarding a right to testify at grand jury proceedings was rendered harmless beyond a reasonable doubt.); Chacko v. United States, 04. Civ. 2258, 2005 WL 1388723 at *6 (S.D.N.Y. June 8, 2005) (errors in grand jury proceedings are generally considered harmless once a defendant has been convicted at a jury trial); James v. United States, 00 Civ. 8818, 2002 WL 1023146 at *12 (S.D.N.Y. May 20, 2002) (§ 2255 petition; "It is well established that a guilty verdict at trial remedies any defects or errors in the grand jury indictment."); Lemons v. Parrott, 01 Civ. 9366, 2002 WL 850028 at *5-6 (S.D.N.Y. May 2, 2002); Barnes v. Giambruno, 01 Civ. 8965, 2002 WL 850020 at *7 (S.D.N.Y. May 2, 2002); Burgess v. Bintz, 00 Civ. 8271, 2002 WL 727011 at *4 (S.D.N.Y. Apr. 24, 2002); McMoore v. Miller, No. 98CV1915, 2002 WL 975305 at *8 (N.D.N.Y. Apr. 19, 2002); Ballard v. Costello, No. 01-CV-1000, 2001 WL 1388297 at *2 (E.D.N.Y. Nov. 2, 2001); Davis v. Protuondo, 00 Civ. 8928, 2001 WL 1273801 at *6 (S.D.N.Y. Oct. 23, 2001) ("[A]n error in grand jury proceedings is necessarily rendered harmless by a trial jury's subsequent finding of guilt beyond a reasonable doubt."); Spulka v. Walker, 97 Civ. 1879, 1998 WL 274287 at *2 (S.D.N.Y. May 27, 1998) ("[T]he guilty verdict of the petit jury cured any defect in the grand jury proceeding.").

Accordingly, Batchilly's grand jury claim should be <u>DENIED</u> because it is not cognizable on habeas review.

## IV. BATCHILLY'S HABEAS CLAIM THAT HIS <u>MIRANDA</u> RIGHTS WERE VIOLATED IS PROCEDURALLY BARRED BY ADEQUATE AND INDEPENDENT STATE LAW GROUNDS

Batchilly claims that his "<u>Miranda</u> rights were violated" when Detectives Gonzalez and Colon allegedly "interrogat[ed]" him without having administered <u>Miranda</u> warnings while they were transporting him to another precinct.  (Dkt. No. 3: Pet. at 6, 37-38, 41, 92-94, 117-18, 126.)

Batchilly raised the same claim in his C.P.L. § 440 motion.  (<u>See</u> pages 33-34 above.) Justice Tallmer held that C.P.L. § 440.10(2) "mandates the denial" of Batchilly's <u>Miranda</u> claim because Batchilly "had every opportunity to challenge the suppression ruling on his direct appeal but failed to raise this ground."  (<u>See</u> page 36 above.)

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice."  <u>Harris</u> v. <u>Reed</u>, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989) (citations & internal quotations omitted).[20]

---

[20]  <u>See also</u>, <u>e.g.</u>, <u>Schlup</u> v. <u>Delo</u>, 513 U.S. 298, 314-16, 115 S. Ct. 851, 860-61 (1995); <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991); <u>Murray</u> v. <u>Carrier</u>, 477 U.S. 478, 485-88, 496, 106 S. Ct. 2639, 2644-45, 2649-50 (1986); <u>Jones</u> v. <u>Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997); <u>Garcia</u> v. <u>Lewis</u>, 188 F.3d 71, 76-77 (2d Cir. 1999); <u>Reyes</u> v.
(continued...)

"[I]n order to preclude federal review [under the adequate and independent doctrine], the last state court to render judgment must 'clearly and expressly state . . . that its judgment rest[ed] on a state procedural bar.'"  <u>Jones</u> v. <u>Vacco</u>, 126 F.3d at 415 (<u>quoting</u> <u>Glenn</u> v. <u>Bartlett</u>, 98 F.3d at 724).  The Second Circuit has made clear that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim."  <u>Velasquez</u> v. <u>Leonardo</u>, 898 F.2d at 9; <u>accord</u>, <u>e.g.</u>, <u>Harris</u> v. <u>Reed</u>, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an <u>alternative</u> holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").[21/]  Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas."  <u>Harris</u> v. <u>Reed</u>, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10.

State courts are not required to use any particular language:

---

[20/]     (...continued)
<u>Keane</u>, 118 F.3d 136, 138-40 (2d Cir. 1997); <u>Glenn</u> v. <u>Bartlett</u>, 98 F.3d 721, 724 (2d Cir. 1996), <u>cert. denied</u>, 520 U.S. 1108, 117 S. Ct. 1116 (1997); <u>Velasquez</u> v. <u>Leonardo</u>, 898 F.2d 7, 9 (2d Cir. 1990).

[21/]     <u>See</u>, <u>e.g.</u>, <u>Garcia</u> v. <u>Lewis</u>, 188 F.3d at 77-82; <u>Glenn</u> v. <u>Bartlett</u>, 98 F.3d at 724-25; <u>see also</u>, <u>e.g.</u>, <u>Santiago</u> v. <u>People</u>, 97 Civ. 5076, 1998 WL 803414 at *4 (S.D.N.Y. Oct. 13, 1998) ("When the state court rejects a claim both on the merits and because it was waived under the state's procedural law, review of the claim on a federal habeas corpus petition is barred.").

> We encourage state courts to express plainly, in every decision potentially subject to federal review, the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim – every state appeal, every denial of state collateral review – in order that federal courts might not be bothered with reviewing state law and the record in the case.

Coleman v. Thompson, 501 U.S. at 739, 111 S. Ct. at 2559.

The cases in this Circuit hold that C.P.L. § 440.10(2) is an "adequate and independent" state procedural ground barring federal habeas review.  See, e.g., Sweet v. Bennett, 353 F.3d 135, 140-41 (2d Cir. 2003) (petitioner's ineffective assistance claim was "well-established in the trial record" and could have been brought on direct appeal and § 440.10(2)(c) was an adequate and independent state law ground that barred federal habeas review); Davis v. Mantello, 42 Fed. Appx. 488, 490 (2d Cir. 2002) ("The unjustifiable failure to raise on direct appeal a claim that appears on the face of the record is a procedural default under New York law and therefore constitutes an independent and adequate state ground for the state court's rejection of the petitioner's claim."), cert. denied, 538 U.S. 986, 123 S. Ct. 1803 (2003); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); Dorsey v. Irvin, 56 F.3d 425, 426 (2d Cir. 1995); Levine v. Commissioner of Corr. Servs., 44 F.3d 121, 126 (2d Cir. 1995) (§ 440.10(2)(c) is adequate and independent state ground), cert. denied, 520 U.S. 1106, 117 S. Ct. 1112 (1997); Nash v. Ercole, 08. Civ. 5293, 2009 WL 2778247 at *6, 13 (S.D.N.Y. Sep. 1, 2009) (440 court's denial of petitioner's Sixth Amendment claim pursuant to C.P.L. § 440.10 (2)(c) "represent[ed] an independent and adequate state-law ground for rejecting the claim"); Saxon v. Ercole, 06 Civ. 77288, 2008 WL 3446488 at *24 (S.D.N.Y. Aug. 12, 2008)

("[F]ederal courts have held that section 440.10(2)(c) is an independent and adequate state-law ground"), aff'd, 338 Fed. Appx. 43 (2d Cir. 2009).[22]/

Because there is an adequate and independent finding by the state § 440 court that Batchilly had procedurally defaulted the Miranda claim, Batchilly would have to show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991). Batchilly does not allege cause,

---

[22]/ See also, e.g., Johnson v. Sabourin, 03 Civ. 0791, 2005 WL 2663039 at *3-5 (S.D.N.Y. Oct. 13, 2005) (§ 440 court's denial of ineffective assistance claims based on facts in trial record pursuant to C.P.L. § 440.10(2)(b) was an adequate and independent state law ground barring federal habeas review); Gillespie v. Miller, 04 Civ. 0295, 2004 WL 1689735 at *12 (S.D.N.Y. July 29, 2004) (Peck, M.J.) (state court's denial of ineffective assistance claim under C.P.L. § 440.10(2) because it could have been raised on direct appeal is adequate and independent ground); Ramos v. Costello, 96 Civ. 3659, 1997 WL 231129 at *2 (S.D.N.Y. May 7, 1997) ("The procedural ground on which the state court denied his § 440.10 motion" – "namely, that they were barred by a New York rule precluding claims that could have been raised on direct appeal but were not" – "is an independent and adequate state ground that prevents him from asserting those claims in a federal habeas corpus proceeding absent cause and prejudice."); Wells v. LaFavre, 96 Civ. 3417, 1996 WL 692003 at *3 (S.D.N.Y. Dec. 2, 1996) ("C.P.L. § 440.10(2) presents an adequate and independent state ground for denying Petitioner relief."); Flowers v. Irvine, No. 94-CV-2240, 1995 WL 669913 at *4 (E.D.N.Y. Oct. 31, 1995) ( "The state court dismissed his claim as 'procedurally defective' because he could have argued this claim previously on direct appeal to the Appellate Division . . . and did not. The decision of the state court in this case clearly rested on state law."); Sykes v. Scully, No. 90-CV-4302, 1992 WL 151896 at *2 (E.D.N.Y. June 16, 1992) ("§§ 440.10(2)(a) and 440.20(2) mandate that such claims are barred from review. This court therefore treats such claims as exhausted and procedurally barred under state law . . ."); Esquilin v. Walker, No. CV-91-4608, 1992 WL 151903 at *3 (E.D.N.Y. June 16, 1992) ("Collateral review is barred since the claim was raised on direct appeal to the Appellate Division. N.Y. C.P.L. § 440.10(2)(a) (collateral review unavailable for claims raised on direct appeal). . . . Therefore, the claim of prosecutorial misconduct must be denied as barred by an independent and adequate state procedural ground."), aff'd, 990 F.2d 624 (2d Cir. 1993).

prejudice or a fundamental miscarriage of justice.  Thus, Batchilly's <u>Miranda</u> claim is procedurally

barred from habeas review and should be <u>DENIED</u>.

## V.    BATCHILLY'S HABEAS CLAIM THAT THE PROSECUTOR'S USE OF PERJURED TESTIMONY VIOLATED HIS DUE PROCESS RIGHTS IS <u>PROCEDURALLY BARRED BY ADEQUATE AND INDEPENDENT  GROUNDS</u>

Batchilly claims that the prosecutor's "use of Perjured Testimony" violated his due

process rights.  (Dkt. No. 3: Pet. at 7, 39-49, 108-16.)

Justice Tallmer noted that Batchilly's identical § 440 claim was based upon:

(1) "[a]lleged inconsistencies between the medical records and the testimony of the outcry witnesses

as to [Feliciano]'s injuries"; (2) "[t]he alleged implausibility of the time line testified to by the People's

witnesses"; and (3) "[a]lleged inconsistencies between police paperwork and police testimony." (<u>See</u>

page 36 above.)  Justice Tallmer denied the claim because "there were sufficient facts on the record

to raise these contentions on direct appeal and there is no justification for [Batchilly]'s failure to

include these claims in his appeal." (<u>See</u> page 36 above.)  Although Justice Tallmer did not explicitly

state that she was denying this claim pursuant to C.P.L. §  440.10(2), the language she used mirrors

C.P.L. §  440.10(2)(c).[23/]

_____

[23/]      C.P.L. § 440.10(2) provides that:

the court must deny a motion to vacate a judgment when:

. . .

(c) Although sufficient facts appear on the record of the proceedings underlying the
judgment to have permitted, upon appeal from such judgment, adequate review of the
(continued...)

Accordingly, this Court infers that Justice Tallmer denied Batchilly's claim pursuant to C.P.L. § 440.10(2).

The cases in this Circuit hold that C.P.L. § 440.10(2) is an "adequate and independent" state procedural ground barring federal habeas review.  See, e.g., Sweet v. Bennett, 353 F.3d 135, 140-41 (2d Cir. 2003); see cases cited in Point IV above.

Because there is an adequate and independent finding by the state § 440 court that Batchilly had procedurally defaulted the perjury claim, Batchilly would have to show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991).  Batchilly does not allege cause, prejudice or a fundamental miscarriage of justice.  Thus, Batchilly's perjury claim is procedurally barred from habeas review and should be DENIED.[24]

---

[23]    (...continued)
           ground or issue raised upon the motion, no such appellate review or determination
           occurred owing to the defendant's . . . unjustifiable failure to raise such ground or
           issue upon an appeal actually perfected by him.

       C.P.L. § 440.10(2)(c).

[24]    In any event, the claim is without merit.  While there may have been minor discrepancies in
       some testimony, Batchilly has offered no evidence of any perjury by any witness, much less
       that the prosecutor knew of any such perjury.

## VI.    BATCHILLY'S HABEAS CLAIM THAT THE PROSECUTION VIOLATED BRADY v. MARYLAND BY WITHHOLDING DNA EVIDENCE IS MERITLESS

Batchilly claims that he was denied due process because the prosecutor violated Brady v. Maryland by withholding initial testing results from the bite mark on Feliciano's lip and not introducing into evidence the pants that Feliciano wore on December 27, 2001.  (Dkt. No. 3: Pet. at 38-39, 98-108.)

When Batchilly raised the same claim in his § 440 motion, Justice Tallmer denied it because Brady "only requires the People to turn over exculpatory evidence.  It does not require the People to call every possible witness or introduce every possible piece of evidence."  (See page 36 above.)

### A.    The Brady v. Maryland Standard

Under Brady v. Maryland and its progeny, state as well as federal prosecutors must turn over exculpatory and impeachment evidence, whether or not requested by the defense, where the evidence is material either to guilt or to punishment.  See, e.g., Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948 (1999); United States v. Bagley, 473 U.S. 667, 676, 682, 105 S. Ct. 3375, 3380, 3383-84 (1985); United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976); Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963).[25/]  The Brady rule also encompasses

---

[25/]    See also, e.g., United States v. Jackson, 345 F.3d 59, 70 (2d Cir. 2003), cert. denied, 541 U.S. 956, 124 S. Ct. 1705 (2004); Shabazz v. Artuz, 336 F.3d 154, 161-62 (2d Cir. 2003); United States v. Gil, 297 F.3d 93, 101, 103 (2d Cir. 2002); United States v. Coppa, 267 F.3d 132, 135, 139 (2d Cir. 2001); United States v. Diaz, 176 F.3d 52, 108 (2d Cir.), cert. denied, 528 U.S. 875, 120 S. Ct. 181 (1999); Tankleff v. Senkowski, 135 F.3d 235, 250 (2d Cir. (continued...)

evidence known only to the police:  "In order to comply with <u>Brady</u>, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'"  <u>Strickler</u> v. <u>Greene</u>, 527 U.S. at 281, 119 S. Ct. at 1948 (quoting <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995)).

      The <u>Brady</u> rule does not require a prosecutor to "deliver his entire file to defense counsel," but only to disclose those items which are material to the defendant's guilt or punishment. <u>United States</u> v. <u>Bagley</u>, 473 U.S. at 675, 105 S. Ct. at 3380; <u>accord</u>, <u>e.g.</u>, <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. at 437, 115 S. Ct. at 1567 ("We have never held that the Constitution demands an open file policy."); <u>United States</u> v. <u>Agurs</u>, 427 U.S. at 108-09, 96 S. Ct. at 2400.[26/]

      "There are three components of a true <u>Brady</u> violation:  [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  <u>Strickler</u> v. <u>Greene</u>, 527 U.S. at 281-82, 119 S. Ct. at 1948.[27/]

---

[25/]    (...continued)
1998); <u>Orena</u> v. <u>United States</u>, 956 F. Supp. 1071, 1090-92 (E.D.N.Y. 1997) (Weinstein, D.J.).

[26/]    <u>See also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Coppa</u>, 267 F.3d at 135; <u>Tate</u> v. <u>Wood</u>, 963 F.2d 20, 25 (2d Cir. 1992); <u>United States</u> v. <u>Gaggi</u>, 811 F.2d 47, 59 (2d Cir.), <u>cert. denied</u>, 482 U.S. 929, 107 S. Ct. 3214 (1987); <u>Hoover</u> v. <u>Leonardo</u>, No. 91-CV-1211, 1996 WL 1088204 at *2 (E.D.N.Y. June 11, 1996).

[27/]    <u>See also</u>, <u>e.g.</u>, <u>Banks</u> v. <u>Dretke</u>, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004); <u>Moore</u> v. <u>Illinois</u>, 408 U.S. 786, 794-95 , 92 S. Ct. 2562, 2568 (1972); <u>United States</u> v. <u>Rivas</u>, 377 F.3d 195, 199 (2d Cir. 2004); <u>United States</u> v. <u>Jackson</u>, 345 F.3d at 71; <u>United States</u> v. <u>Gil</u>, 297 (continued...)

**B.    Application of the Brady Standard to Batchilly's Claim**

Batchilly's Brady claim regarding the bite mark is meritless.  Preliminarily, Batchilly misreads the trial transcript.  Batchilly claims that the prosecutor "[w]ithheld the initial results from the sample collected on the bite mark," which "revealed the source of the bite mark."  (Dkt. No. 3: Pet. at 98-99.)  However, the "initial" test that criminalist Frese performed on the bite mark swab only detected whether there was any DNA on the swab, not the "source" of the DNA.  (See Dkt. Nos. 8-9: Frise: Tr. 608-09, 615.)  She only constructed a "DNA profile" from the underwear and the vaginal swab.  (Frise: Tr. 615.)

To the extent that Batchilly claims that Frese should have conducted furthers tests and constructed a DNA profile for the bite mark, Batchilly has not satisfied the first Brady prong because he has not shown that the DNA profile extracted from the bite mark would have been "favorable" to him.  See, e.g., Mitchell v. Artus, 07 Civ. 4688, 2008 WL 2262606 at *35 (S.D.N.Y. June 2, 2008) (Peck, M.J.) (Petitioner "has not satisfied the first Brady prong because he has failed to show that, even if the bloody wooden door saddle had been recovered and tested initially, the evidence from the saddle would have been 'favorable'" to petitioner.), report & rec. adopted, 2008 WL 3884373 (S.D.N.Y. Aug. 21, 2008); Leake v. Senkowski, 01 Civ.7559, 2004 WL 1464889 at *24-25 (S.D.N.Y. June 30, 2004) (Police failure to collect and test blood samples from bloody stains on the sidewalk

---

27/    (...continued)
      F.3d at 101; United States v. Coppa, 267 F.3d at 140; United States v. Payne, 63 F.3d 1200,
      1208 (2d Cir. 1995), cert. denied, 516 U.S. 1165, 116 S. Ct. 1056 (1996); Orena v. United
      States, 956 F. Supp. at 1090.

H:\OPIN\BATCHILLY

and test a bloody sweatshirt did not constitute a <u>Brady</u> violation because petitioner failed to

"demonstrate either that the blood evidence, if preserved and tested, would have been 'favorable to'

him or that prejudice resulted from the failure to preserve and test it.").

      Furthermore, absent bad faith, a prosecutor's failure to conduct forensic tests does not

violate a federal constitutional right, including a defendant's <u>Brady</u> rights.   <u>See</u>, <u>e.g.</u>, <u>Arizona</u> v.

<u>Youngblood</u>, 488 U.S. 51, 58-59, 109 S. Ct. 333, 338 (1988).[28]   Accordingly, since Batchilly has not

shown that the DNA profile from the bite mark would have been favorable to him and since the

---

[28]    <u>See also</u>, <u>e.g.</u>, <u>Neil</u> v. <u>Walsh</u>, 07 Civ. 6685, 2009 WL 382637 at *5-6 (S.D.N.Y. Feb. 17,
2009) (denying petitioner's claim that the prosecution should have "collected and preserved"
the victim's feces for "potentially exculpatory DNA evidence" because "'[t]he prosecution
is not . . . required to disclose evidence it does not possess or of which it is not aware, and
there is no due process requirement that the government use any particular investigatory tool,
including quantitative testing, to secure exculpatory evidence.'"); <u>Sturdivant</u> v. <u>Barkley</u>, No.
04-CV-5659, 2007 WL 2126093 at *5- 6 (E.D.N.Y. July 24, 2007) (denying petitioner's
claim that the "prosecution's failure to conduct DNA testing on the bags of cocaine in
evidence constituted a violation of <u>Brady</u> v. <u>Maryland</u>" because "the prosecution had no
obligation to perform any additional forensics tests."); <u>Venticinque</u> v. <u>Burge</u>, No. CV-04-
3411, 2005 WL 3369093 at *5 (E.D.N.Y. Dec. 12, 2005) (Rejecting petitioner's claim that
he was denied due process "because the prosecutor failed to conduct DNA or other forensic
analyses on the knife that was used in the underlying assault," since "the prosecutor's failure
to conduct forensic tests does not violate a federal right," citing <u>Arizona</u> v. <u>Youngblood</u>));
<u>Johnson</u> v. <u>New York</u>, No. 02-CV-3752, 03-Misc.-0066, 2003 WL 23198785 at *14
(E.D.N.Y. Nov. 5, 2003) (Weinstein, D.J.) (denying petitioner's claim that the prosecution
violated <u>Brady</u> by failing to "perform tests or procedures available to them to reveal
fingerprint, gun powder residue, or DNA evidence" because "[t]he People were not
constitutionally mandated to perform additional forensic tests on the evidence in this
case. . . ."); <u>Smith</u> v. <u>Edwards</u>, 98 Civ. 7962, 2000 WL709005 at *6 (S.D.N.Y. May 31,
2000) ("[T]here is no due process requirement that the government use any particular
investigatory tool, including quantitative testing [such as DNA testing], to secure exculpatory
evidence. . . . [T]he fact that [petitioner] couches the government's failure to perform DNA
testing in terms of <u>Brady</u> does not convert a legitimate prosecutorial choice into a
constitutional violation.").

prosecution's failure to test the bite mark DNA does not constitute a <u>Brady</u> violation,  Batchilly's bite mark <u>Brady</u> claim should be <u>DENIED</u>.

Batchilly's <u>Brady</u> claim that the prosecutor failed to introduce Feliciano's pants into evidence is equally meritless.  (Pet. at 102-03.)  Batchilly is not claiming that the prosecutor failed to disclose the existence of the pants.  (Pet. at 102-03.)  The prosecutor need not introduce every piece of evidence, but has the discretion to determine what evidence it needs to introduce to prove the charges brought.  <u>See</u>, <u>e.g.</u>, <u>Brown</u> v. <u>Perlman</u>, 07 Civ. 8672, 2008 WL 2009220 at *24 (S.D.N.Y. May 8, 2008) (Peck, M.J.), <u>report & rec. adopted</u>, 2008 WL 2545066 (S.D.N.Y. June 23, 2008); <u>Funches</u> v. <u>Walsh</u>, 05 Civ. 2839, 2006 WL 1063287 at *14 (S.D.N.Y. Apr. 21, 2006) ("Surely, a prosecutor is not obligated to call every possible witness"), <u>aff'd</u>, 264 Fed. Appx. 45 (2d Cir.), <u>cert. denied</u>, 128 S. Ct. 2087 (2008); <u>Ronson</u> v. <u>Comm'r of Corr.</u>, 551 F. Supp. 450, 460 (S.D.N.Y. 1982) ("[I]f the State has introduced evidence sufficient to convince a jury beyond a reasonable doubt that the accused has committed the physical act of shooting the victim, the Constitution does not require them to also supply the weapon; the accused has been given all the due process which he is guaranteed."), <u>aff'd</u>, 742 F.2d 1446 (2d Cir.), <u>cert. denied</u>, 469 U.S. 841, 105 S. Ct. 144 (1984).  Thus, the prosecution had no duty to introduce the pants.

Furthermore, "<u>Brady</u> may not be invoked when defense counsel knew of the existence of the evidence, which was equally available to defense counsel, but chose not to pursue the matter."

Sturdivant v. Barkley, 2007 WL 2126093 at *6.[29/] Here, defense counsel showed his knowledge of

the pants that Feliciano was wearing when he cross-examined her about them.  (Feliciano: Tr2. 94-

96.)  Defense counsel nevertheless did not request to introduce the pants into evidence.  Therefore,

since defense counsel knew about the existence of the pants, Brady cannot be invoked because

defense counsel could have introduced the pants into evidence.  Accordingly, Batchilly's claim that

the prosecutor violated Brady for failing to introduce Feliciano's pants should be DENIED.

## VII.   BATCHILLY'S INEFFECTIVE ASSISTANCE OF COUNSEL HABEAS CLAIMS SHOULD BE DENIED

### A.   The Strickland v. Washington Standard on Ineffective Assistance of Trial Counsel

In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court

announced a two-part test to determine if counsel's assistance was ineffective:  "First, the defendant

must show that counsel's performance was deficient.  This requires showing that counsel made errors

so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

---

[29/]    See also, e.g., United States v. Zagari, 111  F.3d 307, 320 (2d Cir.) ("Brady cannot be
violaated if the defendants had actual knowledge of the relevant information. . . ."), cert.
denied, 522 U.S. 983, 118 S. Ct. 445 (1997); United States v. Zackson, 6 F.3d 911, 918 (2d
Cir.1993); United States v. LeRoy, 687 F.2d 610, 618 (2d Cir.1982), cert. denied, 459 U.S.
1174, 103 S. Ct. 823 (1983); Johnson v. People, 2003 WL 23198785 at *15 ("A Brady claim
would not be available in this case because Brady cannot be invoked when defense counsel
knew of the existence of the evidence, but chose not to pursue the matter."); Smith v.
Edwards, 2000 WL 709005 at *6 ("[T]he absence of a Brady violation is particularly clear
where, as here, the evidence was equally available to the defense, which chose not to pursue
this course of investigation. The rationale underlying Brady is that the defendant should not
be denied access to exculpatory evidence only known to the government.") (citations
omitted).

Amendment."  Id. at 687, 104 S. Ct. at 2064.[30/]  This performance is to be judged by an objective

standard of reasonableness.  Strickland v. Washington, 466 U.S. at 688, 104 S. Ct. at 2064.[31/]

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction . . . .
> A fair assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from counsel's perspective
> at the time . . . .  [A] court must indulge a strong presumption that counsel's conduct
> falls within the wide range of reasonable professional assistance; that is, the defendant
> must overcome the presumption that, under the circumstances, the challenged action
> "might be considered sound trial strategy."

Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[32/]

Second, the defendant must show prejudice from counsel's performance.  Strickland

v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064.  The "question is whether there is a reasonable

probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."

Id. at 695, 104 S. Ct. at 2068-69.  Put another way, the "defendant must show that there is a

---

[30/]    Accord, e.g., Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); Bell v.
Miller, 500 F.3d 149, 156-57 (2d Cir. 2007); Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir.
2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[31/]    Accord, e.g., Wiggins v. Smith, 539 U.S. at 521, 123 S. Ct. at 2535; Bell v. Cone, 535 U.S.
685, 695, 122 S. Ct. 1843, 1850 (2002); Henry v. Poole, 409 F.3d at 63.

[32/]    Accord, e.g., Bell v. Cone, 535 U.S. at 698, 122 S. Ct. at 1852; Bell v. Miller, 500 F.3d at
156-57; Henry v. Poole, 409 F.3d at 63; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001);
Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068.[33]

The Supreme Court has counseled that these principles "do not establish mechanical rules."  Strickland v. Washington, 466 U.S. at 696, 104 S. Ct. at  2069.  The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process.  Id.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or

---

[33]    See also, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Henry v. Poole, 409 F.3d at 63-64; Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542.  The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not."  Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland"); Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").  Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility."  Strickler v. Greene, 527 U.S. at 291, 119 S. Ct. at 1953; cf. id. at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

jury.'" <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001) (quoting <u>Strickland</u> v. <u>Washington</u>, 466

U.S. at 695-96, 104 S. Ct. at 2069); <u>accord</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Hoke</u>, 928 F.2d 534, 538 (2d Cir.

1991).

       The Supreme Court also made clear that "there is no reason for a court deciding an

ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an

insufficient showing on one." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 697, 104 S. Ct. at 2069.[34]

       In addition, the Supreme Court has counseled that "strategic choices made after

thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;

and strategic choices made after less than complete investigation are reasonable precisely to the extent

that reasonable professional judgments support the limitations on investigation. . . . In any

ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgments." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 690-91, 104 S. Ct. at 2066.[35]

---

[34]      <u>Accord</u>, <u>e.g.</u>, <u>Smith</u> v. <u>Robbins</u>, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

[35]      <u>See also</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Gentry</u>, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); <u>Engle</u> v. <u>Isaac</u>,
456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the
Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does
not insure that defense counsel will recognize and raise every conceivable constitutional
claim."); <u>Jackson</u> v. <u>Leonardo</u>, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing <u>Strickland</u>
claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance' and that counsel's conduct was
not the result of error but derived instead from trial strategy. We are also instructed, when
reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and
impose on . . . counsel a duty to raise every "colorable" claim' on appeal.") (citations
(continued...)

As the Second Circuit noted:  "The <u>Strickland</u> standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d at 199; <u>accord, e.g.</u>, <u>Bell</u> v. <u>Miller</u>, 500 F.3d at 156-57.

### 1.   <u>Strickland and the AEDPA Review Standard</u>

For purposes of this Court's AEDPA analysis, "the <u>Strickland</u> standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).[36/]  "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'"  <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d at 95 n.8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly. . . . Rather, he must show that the [First Department] applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner."  <u>Bell</u> v. <u>Cone</u>, 535 U.S. at

---

[35/]      (...continued)
omitted); <u>Mayo</u> v. <u>Henderson</u>, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), <u>cert. denied</u>, 513 U.S. 820, 115 S. Ct. 81 (1994).

[36/]      <u>See also, e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852 (2002); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 518-19 (2d Cir. 2006), <u>cert. denied</u>, 552 U.S. 836, 128 S. Ct. 75 (2007); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 315 (2d Cir. 2001).

698-99, 122 S. Ct. at 1852; see also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003);

Mosby v. Senkowski, 470 F.3d at 519.

B.    **Application of the Strickland Standard to Batchilly's Claims**

1.    **Counsel Was Not Ineffective For Failing to Investigate Batchilly's Alibi and Timely Serve Alibi Notice**

Batchilly claims that counsel was ineffective for failing to investigate his alibi and

speak with Hoo-Hing and for failing to timely serve alibi notice.  (Dkt. No. 3: Pet. at 6, 11, 16, 23,

41-63, 81-82.)[37/]  The First Department held:

> Counsel could have reasonably relied on his client to inform him that he had an alibi. Even if we were to conclude that, with the information available concerning the witness in question, a reasonably competent attorney would have contacted her earlier, we would find that any such omission did not deprive defendant of a fair trial or cause him any prejudice, particularly in light of the weakness of the alibi, as previously noted.

People v. Batchilly, 33 A.D.3d 360, 361-62, 821 N.Y.S.2d 597, 599 (1st Dep't 2006).

The First Department's decision was not contrary to or an unreasonable application of

Supreme Court precedent nor an unreasonable determination of the facts.  Although, as Justice

Tallmer stated during the alibi colloquy (see pages 23-25 above), Batchilly's statement should have

---

[37/]  Although Batchilly's habeas petition's questions presented and fact section discussed counsel's failure to "resign" and return phone calls as separate issue from counsel's failure to investigate Batchilly's alibi, the analysis section only addressed counsel's failure to resign or return phone calls as it affected counsel's failure to investigate Batchilly's alibi. (See Pet. at 6, 23-25, 33, 81.)  Thus, this Court does not address Batchilly's claim that counsel was ineffective for failing to resign and return phone calls separately from his claim that counsel was ineffective for failing to investigate Batchilly's alibi.

alerted counsel to the possibility of an alibi, counsel reasonably could have relied on Batchilly to ensure that he understood the significance of Batchilly's statement and alibi.  According to Schurr's affidavit, Batchilly ignored Schurr's phone calls and letters and gave Schurr witness information in an "untimely and incomplete manner making it nearly impossible to locate and speak with them." (See page 35 above.)  Furthermore, witnesses "failed to cooperate by moving to . . . undisclosed addresses, not returning calls, moving out of New York State, [and] not having a telephone or being given incorrect telephone numbers."  (See page 35 above.)  Batchilly's and the witnesses' failure to communicate and cooperate with defense counsel Schurr does not render Schurr's representation ineffective.  See, e.g., Seaton v. Jabe, No. 91-1903, 983 F.2d 1068 (table), 1993 WL 1291 at *11 (6th Cir. Jan. 5, 1993) (Counsel was not ineffective for failing to locate and interview alibi witness where "petitioner refused to cooperate with his appointed counsel and did not give him the names of the alleged alibi witnesses until . . . less than two days before the trial commenced.  Thus, it was defendant's neglect, not counsel's ineffectiveness, that resulted in the failure to obtain the testimony of the . . . alibi witness."), cert. denied, 508 U.S. 943, 113 S. Ct. 2424, & 509 U.S. 911, 113 S. Ct. 3013 (1993); Chambers v. Cowley, No. 90-6347, 930 F.2d 32 (table), 1991 WL 49759 at *3 (10th Cir. Mar. 26, 1991) ("'[T]he reasonableness of an attorney's decision not to conduct an investigation is directly related to the information the defendant has supplied.'"); United States ex rel. Marcelin v. Mancusi, 462 F.2d 36, 43-45 (2d Cir. 1972) (counsel was not ineffective for failing to mount an insanity defense,  in part, because, "despite repeated requests by counsel to petitioner and members of his family for information that would be helpful to his defense, they said nothing about his 1962

Bellevue admission and indeed at no time indicated to counsel the slightest hint of any prior psychiatric history of petitioner."), cert.denied, 410 U.S. 917, 93 S. Ct. 977 (1973); Collins v. Superintendent Conway, 2006 WL 1114053 at *4 ("Petitioner's claim for ineffective assistance of counsel is likewise unavailing. Petitioner claims his counsel failed to discover the actual lineup records, and that this constitutes ineffective assistance of counsel. Petitioner's claims are entirely dependent on information that the Petitioner himself had at every stage of the proceedings after the alleged lineups. Any failure to assert these claims prior to his guilty plea is therefore a failure of Petitioner not to communicate with his counsel, not a failure of counsel.").

Accordingly, Batchilly's claim that counsel was ineffective for failing to investigate his alibi and timely serve alibi notice should be DENIED.

### 2. Batchilly's Claim that Counsel Was Ineffective For Failing to Request a Missing Witness Charge is Procedurally Barred by Adequate and Independent State Law Grounds

Batchilly claims that counsel was ineffective for failing to request a missing witness charge for Dets. Gonzalez's and Colon's failure to testify to Batchilly's statements. (Dkt. No. 3: Pet. at 6, 23, 26-27, 63-69, 81-82, 126-27.)

Batchilly raised the same claim in his C.P.L. § 440.10 motion. (See page 34 above.) Defense counsel Schurr explained in his affidavit that Batchilly "was never questioned nor did he make any statements regarding the accusations to detectives Gonzalez and Colon. Only detective Marchman gave defendant his Miranda warnings and interrogated him. No other officers were present. Therefore, there was no legal basis to request a missing witness charge." (See page 37

above.)  Justice Tallmer denied Batchilly's claim because Batchilly could have "made this argument on appeal" and, in any event, Schurr's affidavit sufficiently articulated that "there was no legal basis for such a charge."  (See page 37 above.)  Although Justice Tallmer did not explicitly state that she was denying this claim pursuant to C.P.L. § 440.10(2), her opinion obviously was relying on that provision.  The cases in this Circuit hold that C.P.L. § 440.10(2) is an "adequate and independent" state procedural ground barring federal habeas review.  Sweet v. Bennett, 353 F.3d 135, 140-41 (2d Cir. 2003); see cases cited in Point IV above.  Batchilly does not allege cause, prejudice or a fundamental miscarriage of justice.

Thus, Batchilly's ineffective assistance for failure to request a missing witness charge claim is procedurally barred from habeas review and should be DENIED.

### 3.    Counsel Was Not Ineffective For Failing to Consult or Call a Medical Expert to Rebut Dr. Klie's Testimony

Batchilly claims that counsel was ineffective for failing to consult or hire a medical expert to rebut Dr. Klie's testimony.  (Dkt. No. 3: Pet. at 6, 23, 27-31, 69-77, 81-82.)

Batchilly raised this claim in his C.P.L. § 440.10 motion.  (See page 34 above.) Defense counsel Schurr's affidavit (attached to the prosecution's C.P.L. § 440.10 response) explained that he did not call a medical expert because the medical records, which indicated that Feliciano immediately reported the rape and that she had cheek, nose, neck, lip and chest injuries, were consistent with rape.  (See pages 35-36 above.)  "To have consulted and called a defense medical expert would have further corroborated the prosecution's case and prejudiced" Batchilly.  (See pages 35-36 above.) Justice Tallmer denied Batchilly's claim because Schurr's decision not to call a medical

expert was a "reasonable tactical decision" in light of the medical records' consistency with Feliciano's allegations.  (See page 37 above.)

Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."  United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S. 958, 108 S. Ct. 357 (1987); see, e.g., United States v. DeJesus, 57 Fed. Appx. 474, 478 (2d Cir.) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.'  Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed."  Counsel's decision not to call a particular witness was grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with contact information for potential witnesses.") (citation omitted), cert. denied, 538 U.S. 1047, 123 S. Ct. 2110 (2003).[38]

---

[38]    See also, e.g., United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), cert. denied, 538 U.S. 1021, 123 S. Ct. 1949 (2003); United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998), cert. denied, 526 U.S. 1164, 119 S. Ct. 2059 (1999); United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.) ("[T]he tactical decision of whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation."), cert. denied, 522 U.S. 846, 118 S. Ct. 130 (1997); Lawson v. Caspari, 963 F.2d 1094, 1096 (8th Cir. 1992) (Counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, especially where counsel "presented a theory of the case by pointing out the 'weaknesses in the state's case and rais[ing] serious questions about the credibility of the state's sole eyewitness.'"); Reid v. Giambruno, No. 03-CV-0240, 2007 WL 3232497 at *11 (W.D.N.Y. Oct. 31, 2007);
(continued...)

Moreover, "[t]he decision whether to call an expert witness at trial generally falls within the realm of strategic choices that should not be second-guessed by a court on review." Rayford v. Greene, No. 02-CV-0811, 2008 WL 941706 at *8 (W.D.N.Y. Apr. 4, 2008) (citing United States v. Kirsh, 54 F.3d 1062, 1072 (2d Cir.), cert. denied, 516 U.S. 927, 116 S. Ct. 330 (1995)); accord, e.g., Savinon v. Mazucca, 04 Civ. 1589, 2005 WL 2548032 at *33 (S.D.N.Y. Oct. 12, 2005) (citing cases), report & rec. adopted, 2005 WL 2548032 (S.D.N.Y. Sept. 18, 2006), aff'd, 318 Fed. Appx. 41 (2d Cir.), cert. denied, 130 S. Ct. 497 (2009); Stapleton v. Greiner, No. 98 CV 1971, 2000 WL 1207259 at *16 (E.D.N.Y. July 10, 2000) (Raggi, D.J.).  This is especially so where petitioner "'has only presented his vague hope that another expert might have reached a different result than the government expert.'"  Savinon v. Mazucca, 2005 WL 2548032 at *33.

---

38/      (...continued)
Harris v. Hollins, 95 Civ. 4376, 1997 WL 633440 at *6 (S.D.N.Y. Oct. 14, 1997) (counsel not ineffective for not securing alibi witnesses where counsel presented a vigorous defense); Jones v. Hollins, 884 F. Supp. 758, 765-66 (W.D.N.Y. 1995) ("Generally, the decision whether to pursue a particular defense is a tactical choice which does not rise to [the] level of a constitutional violation. . . .  [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed . . . ,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial.") (citations omitted), aff'd, No. 95-2279, 89 F.3d 826 (table), 1995 WL 722215 (2d Cir. Nov. 30, 1995); Lou v. Mantello, No. 98-CV-5542, 2001 WL 1152817 at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.") (quoting Ruzas v. Sullivan, 85 Civ. 4801, 1988 WL 83377 at *14 (S.D.N.Y. Aug. 2, 1988)); Rodriguez v. Mitchell, 92 Civ. 2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

Nevertheless, "'[i]n some instances, the failure to call an expert witness may satisfy the two-pronged ineffective assistance of counsel standard.' However, '[w]here an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant.'" Massaro v. United States, 97 Civ. 2971, 2004 WL 2251679 at *4 (S.D.N.Y. Oct. 5, 2004), aff'd, 152 Fed. Appx. 20 (2d Cir. 2005); see also Stapleton v. Greiner, 2000 WL 1207259 at *16 ("[I]n some circumstances, an attorney's failure to arrange for an independent expert examination of critical evidence may be so objectively unreasonable as to violate the Sixth Amendment.").

Batchilly's counsel's strategy not to confer with or call a medical expert was a reasonable strategic choice.  Instead of calling a medical expert that may have corroborated the prosecution's case, counsel, who appeared well versed in rape evidence, exploited the weaknesses in Dr. Klie's testimony.  The only injury that Dr. Klie or the resident observed was the bite mark on Feliciano's lip.  (See page 7 above.)  Dr. Klie did not see any external vaginal trauma.  (See page 7 above.)  Schurr elicited from Dr. Klie that he could not "recall what [the bite mark] looked like at th[e] time," that there were no "teeth marks" on Feliciano's lip, that "no external injuries . . . could also be consistent with no sexual abuse," and that he failed to send Feliciano to another hospital for an examination with a colposcope.[39]  (Dkts. No. 8-9: Klie: Tr. 500, 503, 505.)  Schurr also emphasized that this was the resident physician's first time performing a rape kit.  (Klie: Tr. 506.)

---

[39]    "A colposcope is basically a microscope that is inserted into the vagina with a magnification device so that you can get a better look than you would with the naked eye for any signs of vaginal trauma or lacerations."  (Klie: Tr. 491.)

Furthermore, this Court will not second-guess Schurr's determination because Batchilly has failed to offer any contrary explanation for counsel's decision or what a defense expert could have testified to.  See Mitchell v. Artus, 07 Civ. 4688, 2008 WL 2262606 at *30 (S.D.N.Y. June 2, 2008) (Peck, M.J.) (denying petitioner's claim that counsel was ineffective for failing to call a DNA expert to rebut another expert's testimony, in part, because petitioner "failed to offer any contrary explanation for counsel's decision not to have [expert] testify."), report & rec. adopted, 2008 WL 3884373 (S.D.N.Y. Aug. 21, 2008); Savinon v. Mazucca, 2005 WL 2548032 at *33 ("The decision of trial counsel not to call an expert 'cannot be considered objectively unreasonable,'" where petitioner has not provided an "affidavit or other basis on which to conclude that there existed a witness who could have offered relevant and probative evidence contrary to the testimony offered" by the prosecution's expert witness.); Stapleton v. Greiner, 2000 WL 1207259 at *14 (counsel not ineffective for failure to call an expert to authenticate potential evidence because petitioner came "forward with no affidavits or other admissible evidence indicating that any expert witness could have identified the voices or handwriting as [petitioner] proposes. Absent such evidence it is difficult to imagine any prejudice.").

Accordingly, since Batchilly cannot demonstrate that trial counsel's failure to call a rebuttal medical expert was an unreasonable strategic decision, much less that the § 440 court's decision was an unreasonable application of Supreme Court precedent, Batchilly's medical expert ineffective assistance habeas claim should be DENIED.

### 4.   Counsel Was Not Ineffective For Failing to Secure Batchilly's Appearance Before the Grand Jury and For Failing to File a Motion to Dismiss the Indictment Based on Defective Grand Jury Proceedings

Batchilly claims that counsel was ineffective for failing to secure Batchilly's appearance before the grand jury and for failing to file a motion to dismiss the indictment based on defective grand jury proceedings.  (Dkt. No. 3: Pet. at 34, 81-92.)

Upon Batchilly raising the same claim in his C.P.L. § 440.10 motion, Justice Tallmer denied it "because counsel has provided a reasonable explanation of his actions and there would have been no merit to such a motion, inasmuch as defendant expressly waived his right to testify before the grand jury."  (See page 37 above.)  In other words, Justice Tallmer credited defense counsel Schurr's affidavit testifying that Batchilly told Schurr that his grand jury rights "had not been violated because he knowingly and voluntarily declined to testify."  (See page 37 above.)  While Batchilly says the opposite, he has not rebutted Justice Tallmer's finding of fact by clear and convincing evidence (see page 37 above), and thus the presumption of correctness of Justice Tallmer's factual finding remains under the AEDPA.  28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct."); see, e.g., Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006) ("[A] state court's determination of a factual issue is presumed to be correct, and is unreasonable only where the petitioner meets the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'") (quoting 28 U.S.C. § 2254(e)(1)), cert. denied, 549 U.S. 1257, 127 S. Ct. 1383 (2007); Kendall v. Connolly, 08 Civ. 6785, 2009 WL 162899 at *7 (S.D.N.Y. Jan. 14, 2009) (Peck, M.J.); Neely v. Marshall, 07 Civ. 9267, 2008 WL 2755830 at *9 (S.D.N.Y. July 14,

2008) (State trial court's factual determination that trial counsel properly advised petitioner of the rights he would be waiving by pleading guilty is entitled to deference on habeas review.), report & rec. adopted, 2008 WL 4090215 (S.D.N.Y. Sept. 3, 2008); Garson v. Perlman, 541 F. Supp. 2d 515, 523 (E.D.N.Y. 2008) (State court's determination that petitioner's "risk of flight was too high to permit bail pending appeal [is] a factual finding entitled to deference under 28 U.S.C. § 2254(e)(1)."); Williams v. Phillips, 04 Civ.4653, 2005 WL 1806161 at *10 n.6 (S.D.N.Y. Aug. 2, 2005) (Peck, M.J.) ("Pursuant to 28 U.S.C. § 2254(e)(1), the factual findings of the § 440 court are entitled to AEDPA deference and this Court presumes them to be correct unless petitioner can prove otherwise by clear and convincing evidence."); Kemp v. Conway, 03 Civ. 5439, 2005 WL 107096 at *4 (S.D.N.Y. Jan. 14, 2005) (State trial court's determination that petitioner was competent to proceed to trial without ordering a competency hearing is entitled to deference under 28 U.S.C. § 2254(e).).

Even if Justice Tallmer had not made findings of fact, Batchilly's claim still would be meritless:

A defendant's right to testify before the grand jury is not a constitutional right; rather, it is a statutorily created right. N.Y. Crim. Proc. Law § 190.50(5). New York courts have consistently held that counsel's failure to ensure that the defendant testifies before the grand jury does not amount to ineffective assistance of counsel.

Davis v. Mantello, 42 Fed. Appx. 488, 491 n.1 (2d Cir. 2002) (citing federal & N.Y. cases), cert. denied, 538 U.S. 986, 123 S. Ct. 1803 (2003); accord, e.g., Alston v. Giambruno, No. 06-CV-6339, 2009 WL 5171860 at *6 (W.D.N.Y. Dec. 21, 2009) ("[A] defendant's right to testify before the grand jury is not a federal constitutional right; rather, it is statutorily-created. See C.P.L. § 190.50(5). Thus, it is not a cognizable habeas claim where counsel fails to ensure that the defendant testifies before the

grand jury."); Affser v. Murray, No. 04 CV 2715, 2008 WL 2909367 at *7 (E.D.N.Y. July 28, 2008) ("[C]ounsel's alleged failure to secure petitioner's presence before the grand jury does not constitute ineffective assistance.").

Accordingly, Batchilly's claim that counsel was ineffective for failing to secure Batchilly's appearance before the grand jury and for failing to file a motion to dismiss the indictment based on defective grand jury proceedings should be DENIED.

## VIII.  BATCHILLY'S EXCESSIVE SENTENCE HABEAS CLAIM IS UNCOGNIZABLE ON HABEAS REVIEW

Batchilly's excessive sentence claim (Dkt. No. 3: Pet. at 7, 41, 118-19) should be denied because it is not cognizable on habeas review.

An excessive sentence claim does not provide a basis for habeas relief, because "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992).[40/]

In this case, it is undisputed that Batchilly's sentence is within the range prescribed by state law.  First degree sexual abuse is a class D felony, carrying a maximum sentence of seven years imprisonment.  Penal Law §§ 130.65, 70.00(2)(d).  Batchilly was sentenced to six years imprisonment.  (See page 31 above.)  Second degree unlawful imprisonment is a class A

---

[40/]    Accord, e.g., Garcia v. Rivera, 07 Civ. 2535, 2007 WL 2325928 at *17 & n.18 (S.D.N.Y. Aug. 16, 2007) (Peck, M.J.) (& cases cited therein); see Thomas v. Senkowski, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) ("It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal habeas relief."); see also, e.g., Townsend v. Burke, 334 U.S. 736, 741, 68 S. Ct. 1252, 1255 (1948) (severity of sentence generally not reviewable on habeas).

misdemeanor, carrying a maximum sentence of one year imprisonment.   Penal Law §§ 135.05,

70.15(1).  Batchilly was sentenced to one year imprisonment to run concurrently with the six years

imprisonment on the first degree sexual abuse count.   (See page 31 above.)  Because Batchilly's

sentence is within the statutory range, it is not reviewable on habeas corpus by this Court as

"excessive."  Batchilly's excessive sentence habeas claim should be DENIED.

## CONCLUSION

For the reasons set forth above, Batchilly's habeas petition should be DENIED in its

entirety and a certificate of appealability should not be issued.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.[41/]  Such objections (and any responses to objections) shall be

filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable

George B. Daniels, 500 Pearl Street, Room 630, and to my chambers, 500 Pearl Street, Room 1370.

Any requests for an extension of time for filing objections must be directed to Judge Daniels (with

a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections

for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension

Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86

---

[41/]   If the pro se petitioner requires copies of any of the cases reported only in Westlaw,
petitioner should request copies from defense counsel.  See Lebron v. Sanders, 557 F.3d 76,
79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.1(c)

H:\OPIN\BATCHILLY

(1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d

Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>,

892 F.2d 15, 16 (2d Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988);

<u>McCarthy</u> v. <u>Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72.

Dated:   New York, New York
         April 2, 2010

Respectfully submitted,

Andrew J. Peck
United States Magistrate Judge

Copies to:   Sulayman Batchilly
             Kayonia Whetstone, Esq.
             Judge George B. Daniels

H:\OPIN\BATCHILLY